SEVERIANO RIVERA PITRE, demandantes y recurridos, *v.* ISABEL GALARZA MARTÍNEZ y OTROS, demandados y recurrentes.

*Número:* R-78-334        *Resuelto:* 20 de marzo de 1979

---

*Ferrer & Alcaraz* y *Leopoldo Tormes,* abogados de los recurrentes; *Ramón Edwin Colón Pratts,* abogado de los recurridos excepto Francisco Rivera Pitre; *Víctor Antulio Vélez Cardona,* abogado del recurrido Francisco Rivera Pitre.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

La cápsula de hechos esenciales para la disposición de este recurso es la siguiente. Flores Rivera Mercado, residente de San Sebastián, otorgó testamento abierto el 19 de agosto de 1973 en *Aguadilla,* ante el notario Jorge L. Chaar Cacho y los testigos instrumentales, *vecinos de San Sebastián,* Agustín Vélez Cabán, Miguel Colón Cordobés y Pedro González Matías. Alertados por el Inspector de Protocolos sobre el problema relativo a la vecindad de los testigos, se acordó y otorgó en 4 de junio de 1975, otro testamento idéntico al anterior. Rivera Mercado falleció el 16 de diciembre de 1975.

En acción instada por unos coherederos, el Tribunal Superior, Sala de Aguadilla, decretó ineficaces ambos testamentos por no haberse observado varias formalidades consignadas en el Código Civil. No existe duda o controversia alguna respecto a que los testamentos recogen fielmente la última voluntad de Rivera Mercado y que los testigos instrumentales antes mencionados conocían real y satisfactoriamente a dicho testador.

A solicitud de su viuda y albacea, la codemandada Isabel Galarza Martínez, acordamos revisar y examinar la validez

o nulidad del primer testamento (¹) a la luz de lo dispuesto en el Art. 630 de dicho cuerpo legal. (²)

## I

■ A manera de introito, resulta menester señalar brevemente cuál es la regla de intrepretación en casos en que se cuestiona la validez de un testamento. Primeramente, salta a la vista que debido a que en el momento en que una disposición testamentaria ha de surtir sus efectos, el protagonista del documento no está presente para aclarar cualquier extremo, se exige que el acto esté rodeado con las mayores garantías posibles en cuanto a aspectos tales como el documento, funcionario autorizante, capacidad del testador, características de los testigos, firmas y otros. Mediante estas salvaguardas y precauciones se intenta disuadir e imposibilitar que personas deshonestas o poco escrupulosas falsifiquen o alteren las condiciones bajo las cuales se otorgan, además de evitar presiones o coacciones indebidas que afecten la voluntad y plena consciencia de una persona.

"Para evitar el fraude y prevenir la mala fe, todas las legislaciones han establecido determinadas solemnidades o requisitos para el otorgamiento de los testamentos, que a la vez que sirvan de garantía contra las falsedades y simulaciones, constituyen una prueba de su verdad en las manifestaciones de la última voluntad; y tal importancia tiene la observancia de dichas solemnidades o requisitos, que de ellas depende la validez o nulidad de las disposiciones testamentarias.

Todo el problema jurídico relativo a la forma de los testamentos consiste en la acertada elección de aquellos requisitos,

---

(¹) En cuanto al segundo testamento, su nulidad es absoluta y no se cuestiona.

(²) Reza en parte:

"No podrán ser testigos en los testamentos:

(2) Los que no tengan calidad de vecinos o domiciliados en el lugar del otorgamiento, salvo los casos exceptuados por la ley. . . ." (31 L.P.R.A. sec. 2146.)

que haciendo imposible o cuando menos difícil la falsificación de la voluntad del testador, no disminuyan ni coarten la libertad en el ejercicio de la testamentifacción activa; y el Código, inspirándose en este criterio, ha procurado establecer los más eficaces para asegurar la verdad y la autenticidad del testamento, y para facilitar, además, la expresión de las últimas voluntades.

Estas solemnidades o requisitos han variado y deben variar según las circunstancias de tiempo y de lugar, y así lo hemos visto comprobado en la reseña histórica hecha en la introducción inicial de este título." Manresa, *Comentarios al Código Civil Español,* Tomo 5, 606–607 (1972).

En segundo lugar, se reconoce que el enfoque judicial apropiado y de vanguardia es aplicar los preceptos legislativos de manera tal que se cumpla, de ser evidente, la última voluntad del testador. Una interpretación juiciosa, evaluando cuáles formalidades afectan la esencia y validez del otorgamiento, frente a aquellas que no destruyen la legitimidad del documento—impregnado con un prudente arbitrio de equidad —es necesario. Manresa, *op. cit.,* 670; Scaevola, *Comentarios del Código Civil,* Tomo XII, 360 (2da. ed.); Osorio Morales, *Manual de Sucesión Testada,* 31 (1957); Puig Brutau, *Fundamentos de Derecho Civil,* Tomo V, Vol. II, 49 (1977). A tal efecto, en *Paz* v. *Fernández,* 76 D.P.R. 742, 751–752 (1954), adoptamos este enfoque y nos pronunciamos del siguiente modo:

"Cierto es como sostienen los apelantes y como nos expresamos en *Ex Parte Planis* v. *Pueblo,* 42 D.P.R. 689, 691, que la forma de testamentos es algo solemne creado por el estatuto. Si no se siguen las formalidades de ley no tiene validez el testamento. Tales formalidades no son meras cuestiones de evidencia, sino requisitos substantivos. Sin estos no hay testamento. *Sin embargo, la apreciación de si en un testamento se han cumplido o no las formalidades legales es materia que incumbe a los tribunales, [citas omitidas], ya que el cumplimiento de aquellas es cuestión de hecho que compete al tribunal, en su apreciación, determinar, antes de que pueda declarar nula una disposición testamentaria en la cuál aparezca expresada clara y terminantemente la voluntad del testador.* [Citas omitidas]

Ya hemos indicado que las formalidades señaladas por los apelantes como incumplidas no eran de las esenciales que la ley exige que aparezcan consignadas en la escritura del testamento, o sea, no eran de las formalidades *de fondo* que, al quedar incumplidas, producen 'ab initio', la nulidad del testamento a distinción de las solemnidades externas o de forma, [citas omitidas], la apreciación de las cuales, en cuanto a si se han observado o no y sus consecuencias ha de determinar el tribunal, ya que, 'en principio no deben ser ni más ni menos que las precisas para hacer auténtica, segura y permanente la última voluntad.' Clemente De Diego, Derecho Civil Español, pág. 52. El criterio que debe regir para tales determinaciones 'no dá igual valor a todas las solemnidades del testamento, ni admite que la falta de cualquiera de ellas lleve siempre aneja la sanción de nulidad del acto. Si bien a tenor del Art. 687 del Código Civil Español, [cita], será nulo el testamento en cuyo otorgamiento no se haya observado las formalidades respectivamente establecidas, se impone, según regla de buen criterio, dada la naturaleza y significación de aquél, tener en cuenta la índole de dichas formalidades para apreciar, con relación a su trascendencia, el límite dentro del que pueden conceptuarse cumplidas, armonizando la voluntad conocida de un testador con los requisitos externos de su expresión' [citas omitidas]." (Bastardillas nuestras.)

## II

Tomando en consideración lo expuesto, examinemos el estado doctrinario casuístico sobre el requisito que nos ocupa.

■ En *Rodríguez* v. *Rodríguez*, 62 D.P.R. 885, 889 (1944) y *Arroyo* v. *Fernández*, 68 D.P.R. 514, 518 (1948), siguiendo la antigua tradición española resolvimos que en la terminología del Art. 630, el concepto "lugar" con referencia a la condición de vecindad o domicilio, estaba forzosamente atado a la idea de una demarcación municipal. En consecuencia adoptamos como norma jurisprudencial que una persona estaba inhabilitada para intervenir como testigo en un testamento si no estaba domiciliada en el municipio en que se otorgaba el instrumento. Esta incapacidad, siguiendo la doctrina aceptada, es de naturaleza "relativa", aunque de índole

*general,* por aplicarse a los testigos en todas las formas testamentarias. Castán, *Derecho Civil Español, Común y Foral,* Tomo 6, II, 54 (1973). No ha estado exenta de crítica, señalándose lo difícil que resulta su justificación. Armero, *Testamentos y Particiones,* Tomo I, 130–131 (1951). Pérez-Ardoyo, en *Testamentos Notariales sin Testigos,* Rev. de Derecho Notarial, Núm. 39, 277–287 (1963), critica esta exigencia a la luz de un examen del "testamento ológrafo". Y la utilidad de los testigos instrumentales ha sido evaluada y atacada a base de un análisis de las siguientes funciones: (1) probatoria del contenido o veracidad del testamento; (2) como coautorizantes; (3) como parte de la solemnidad, seriedad y gran valor del acto; (4) asegurar identidad del testador; y (5) atestar su capacidad mental. Bloch Rodríguez, *Los Testigos en los Testamentos Notariales,* Rev. de Derecho Notarial, Núm. 16, 353–390 y Núm. 17–18, 315–331 (1957).

■　Hemos reflexionado nuevamente sobre nuestra interpretación literal del artículo que nos ocupa restringiendo los testigos a aquellos que estén domiciliados en el lugar del otorgamiento. En España el artículo .equivalente fue enmendado en 1ro. de abril de 1939 para adoptar, como alternativa al requisito de domicilio, el conocimiento personal de los testigos de la persona del testador, Armero, *op. cit.,* 131. No existe duda que la participación de testigos idóneos es una formalidad esencial o de solemnidad (*ad solemnitatem*) para la validez del testamento. Lacruz y Sancho, *Derecho de Sucesiones,* Tomo I, 361–364 (1971); Osorio, *op. cit.,* 65; Vila Plana, *Instituciones de Derecho Sucesorio,* 164–166 (1963); Diego Espín, *Manual de Derecho Civil Español,* Vol. V, 233 (3ra. ed.); Castán, *op. cit.,* 51; Bionda, *Sucesión Testamentaria y Donación,* 60–63 (1960); A. Coello, *Sucesiones,* Tomo I, 164–165 (1952); y Valderde, *Tratado de Derecho Civil Español,* Tomo V, 63 (1939). Puig Brutau, resume la cuestión así:

"Los testigos son las personas que han de presenciar el acto del otorgamiento *por disposición imperativa de la ley. Su inter-*

*vención tiene el valor de una formalidad solemne e indispensable para la validez del testamento.* . . . No constituyen solamente un medio de prueba del hecho del otorgamiento, sino que se trata de un requisito esencial para su validez, puesto que su concurrencia lo exige el Código de manera indispensable para la validez del acto." *Op. cit.,* 52. (Bastardillas nuestras.)

Ahora bien, como afirma Castán, la "legislación positiva . . . , no siempre ajusta a estos principios racionales las reglas sobre aptitud de los testigos, y conserva causas de incapacidad solo fundadas en convencionalismos tradicionales." *Op. cit.,* 52. Manresa, se refiere a la cuestión del siguiente modo:

"El requisito de la vecindad—como dice Diez Picazo—es antiguo y viene ya exigido por el ordenamiento de Alcalá y por la Ley de Toro. *Se busca una garantía en el conocimiento de las personas y de las circunstancias que proporcionan la vecindad.* En realidad, este requisito que podría tener algún sentido en el Derecho Medieval, en que los núcleos urbanos eran reducidos, *carece por completo de sentido en los tiempos actuales,* en que, dada la extensión de los núcleos urbanos, *la identidad, del domicilio entre el otorgante y los testigos nada significa.* Por otra parte, ha planteado el problema siempre de distinguir entre vecindad y domicilio. En este sentido, Burgos de Paz asimilaba el término de vecino al de habitante (incola) que no se pierde por el hecho de habitar algún tiempo en distinto pueblo. *Sin embargo, los autores se inclinan por un criterio amplio y Matienzo es del parecer que todos los que no son forasteros (omnes qui non sunt forenses) pueden ser testigos del testamento."* *Op. cit.,* 639. (Bastardillas nuestras.)

Si el propósito de la disposición sobre idoneidad es el conocimiento por parte de los testigos instrumentales de las circunstancias que confiere el convivir en una comunidad, ¿puede sostenerse racionalmente que los testigos señores Vélez Cabán, Colón Cordobés y González Matías residentes y vecinos del testador, no estaban mejor capacitados para llevar a cabo dicha función, que cualesquiera otros testigos domiciliados en Aguadilla? ¿Bajo cuáles circunstancias se cumple el objetivo legislativo de proteger mejor la última voluntad del testa-

dor contra el fraude, la simulación, falsedad o el engaño? Las respuestas a estas interrogantes son claras. La sala de instancia las consideró, aunque con escrupuloso respeto a la jurisprudencia de *Rodríguez y Arroyo*, supra, se abstuvo de disponer del caso conforme al ilustrado criterio que expresó en la forma siguiente:

"Pero de 1902 a 1978 en Puerto Rico han ocurrido trascendentales transformaciones. La historia nos enseña que nuestros pueblos de 1902 eran recintos donde reinaba un ambiente de hermandad, donde las relaciones de vecindad eran muy estrechas, donde los medios de comunicación y transportación, comparados con nuestra vida presente eran virtualmente de rasgos primitivos—aquel Puerto Rico de 1902, hoy, tres cuartos de siglo después, ha desaparecido—nos enfrentamos ahora a un Puerto Rico con tendencias cosmopolitas donde el producto obtenido en la ruralía céntrica se mercadea con más facilidad y en mayor volumen en los centros metropolitanos que en las otrora bulliciosas plazas del mercado municipales; nuestra gente del centro de la isla busca su recreación, su educación, y realiza gran parte de su actividad ordinaria no en relación a la plaza de recreo de su pueblo, o en la botica, o en el colmado del barrio, sino en la gran urbe. Hoy nos hemos transformado y nos desplazamos para una y otra cosa a los centros comerciales, a los supermercados, a las tiendas por departamentos. Esto, sumado a masivos movimientos migratorios del campo a la ciudad, y toda esa pléyada de cambios sociales que han sacudido nuestras formas y costumbres de vida de principios de siglo, han producido, entre otros, que las relaciones de vecindad, aquello de pueblo chiquito donde todos nos conocemos hayan desaparecido. No es cosa extraña hoy que entretanto desconocemos quienes son nuestros vecinos, mantenemos relaciones más estrechas con aquellos que formaron nuestra primitiva vecindad pero que por efecto de los cambios expresados viven dispersos a través de la isla, o fuera de ella.

España, atendiendo los reclamos de las transformaciones sociales y culturales, revisó hace 40 años su precepto legal en la materia que nos concierne. Puerto Rico, acaso como efecto de esa pasmosa desidia que repetidamente perpetúa estatutos ya de largo no compatibles con la problemática social que se propone reglamentar y que ignora la necesidad de la revisión continua

del derecho codificado para armonizarlo con la sociedad a que sirve, aún mantiene ese anacronismo estatutario que contraviene, o cuando menos, niega reconocimiento a nuestra presente realidad de pueblo en rápida evolución y cambio.

*El caso ante nos pone de manifiesto el problema. Un ciudadano se propone disponer su voluntad para después de su muerte. Escoge los testigos que le son conocidos y de confianza, y que reúnen todos los requisitos y condiciones de idoneidad para serlos. Escoge el Notario. Expresa al Notario su voluntad postrera. Se redacta el testamento. Se reúnen para su otorgamiento. Todo conforme a derecho. Sin embargo, por un simple accidente geográfico de ubicación de las personas—testador, testigos, notario—en el acto de otorgamiento, esa voluntad postrera se nulifica.* San Sebastián, Moca, Aguadilla, son pueblos vecinos, pueblos integrados social, cultural y económicamente; pueblos unidos por vías telefónicas, redes de carretera, donde el intercambio social es continuo, cotidiano; donde el residente de uno se mueve todos los días a trabajar en los otros, donde lo producido en uno se mercadea en cualquiera de los tres. Pero el estatuto impone que para testar, para ese acto solemne de expresión de voluntad póstuma, el testador lo puede hacer en cualquier parte de la isla, con una condición: si es fuera de su pueblo donde tiene su residencia, los testigos tendrán que ser no sus vecinos y relacionados diarios, con quienes va al club, a la iglesia, al juego de dominó, al parque, al baile, al cine, aquellos con cuyos hijos comparten los suyos en la escuela. No. Han de ser testigos los residentes del lugar donde se otorga el testamento, aunque tales testigos solo conozcan al testador accidentalmente y para solo el acto de tal otorgamiento. Acaso estos testigos, extraños a la vecindad del testador, ignoran su estado civil, su progenie, sus bienes. ¡Pero residen en el lugar del otorgamiento! Tal contrasentido es simplemente insostenible y contra toda lógica racional."

■ A la luz de lo expuesto, la realidad contemporánea puertorriqueña, resolvemos que la terminología del Art. 630 del Código Civil no impide que puedan comparecer como testigos instrumentales en testamentos, personas "vecinas" que residan en Puerto Rico, siempre y cuando conozcan realmente al testador. Así le damos vivencia al sentir y propósito del Poder Legislativo. Cualquier otra conclusión resultaría

". . . excesivamente radical, cuando el requisito inobservado o defectuosamente cumplido no responde a una finalidad práctica suficientemente justificada por la necesidad de garantizar la sinceridad o autenticidad del testamento." Osorio, citado en Lacruz-Sancho, *op. cit.*, 359.

*Se dictará sentencia revocando el dictamen del Tribunal Superior, Sala de Aguadilla que invalidó el testamento abierto otorgado el 19 de agosto de 1973; y en su consecuencia se dictará la validez de dicho testamento.*

El Juez Presidente Señor Trías Monge concurre en el resultado sin opinión. El Juez Asociado Señor Martín está conforme y además emitió opinión concurrente a la cual se une el Juez Asociado Señor Torres Rigual. El Juez Asociado Señor Díaz Cruz emitió opinión disidente y concurrente en el resultado. El Juez Asociado Señor Irizarry Yunqué no intervino.

—O—

Opinión concurrente del Juez Asociado Señor Martín a la cual se une el Juez Asociado Señor Torres Rigual.

San Juan, Puerto Rico, a 20 de marzo de 1979

El concepto de "vecindad" lo equiparamos al de "unidad municipal" en 1944 en *Rodríguez* v. *Rodríguez*, 62 D.P.R. 885, por ser ésa la directriz utilizada en España cuando allá regía la disposición del Código Civil equivalente al Art. 630 del nuestro. Sin embargo, la interpretación que entonces hicimos debe ceder ante las circunstancias de la época en que vivimos. Ya en 1939 España había advertido cuán obsoleto resultaba el antiguo concepto de vecindad en la época moderna, y legisló para reconocer que los no domiciliados en el lugar del otorgamiento de un testamento tenían la capacidad de ser testigos, siempre y cuando asegurasen conocer al testador y el Notario

conozca a éste y a aquéllos. (¹) Manresa, J. M., *Comentarios al Código Civil Español*, Vol. V, pág. 622, *et seq.*, Madrid, 1972.

En Puerto Rico, desde la vigencia del Código Civil, ha habido fluidez en cuanto a la demarcación geográfica de los municipios. Desde la Ley Foraker de 1900 la Asamblea Legislativa ha tenido la facultad de crear, consolidar y reorganizar municipios. Carta Orgánica del 12 de abril de 1900, cap. 191, sec. 32, 31 Stat. 83. Tal facultad continuó bajo la Ley Jones de 1917. Carta Orgánica de 1917, cap. 145, Art. 37, 39 Stat. 964. Fue dejada en vigor por la Ley de Relaciones Federales de 3 de julio de 1950, cap. 446, Art. 4, 64 Stat. 319; y luego fue incorporada a la Constitución del Estado Libre Asociado que faculta a la Legislatura para "crear, suprimir, consolidar y reorganizar municipios [y] modificar sus límites territoriales." Art. VI, Sec. 1.

La Asamblea Legislativa ha ejercido dicho poder en múltiples ocasiones resultando ello en la creación de nuevos municipios, en la abolición de otros, en la fusión de algunos y en

---

(¹) El presente caso no plantea problema que podamos resolver a base de la conocida clasificación de incapacidad de testigos que distingue entre incapacidades relativas e incapacidades absolutas. Las incapacidades *absolutas*, son las que inhabilitan a una persona para intervenir en cualquier testamento. Son absolutas, entre otras, la de los menores de edad, la de los que no están en su sano juicio y la de los ciegos y totalmente sordos o mudos. Por otra parte, se les llama *relativas* a las que inhabilitan tan solo para los testamentos en que concurran determinadas circunstancias, afectando la incapacidad relativa los no domiciliados en el lugar del otorgamiento, el cónyuge o parientes del notario etc. . . . . Así pues el cónyuge del notario es hábil para ser testigo en cualquier testamento pues no adolece de incapacidad natural alguna, excepto en aquellos testamentos que otorgue su consorte. Ahora bien, una vez que concurren las circunstancias que dan lugar a la incapacidad, el efecto es el mismo: la nulidad del testamento por faltar, como expone la opinión del Tribunal, un requisito indispensable en la solemnidad testamentaria. Ver Manresa, J. M., *Comentarios al Código Civil Español*, Tomo 6, Vol. II, pág. 50 *et seq.*, Madrid, 1973; Puig Brutau, J., *Fundamentos de Derecho Civil*, Tomo V, Vol. II, pág. 52, Barcelona, 1977. Sin embargo, con la interpretación que hoy adopta el Tribunal del concepto de "vecindad" se resuelve el problema que en casos como el de autos presentaba la incapacidad relativa resultante de no ser domiciliado del lugar del otorgamiento.

la división de varios. En 1902, por ejemplo, a poco tiempo del cambio de soberanía, había 68 municipios que fueron reducidos por ley a 48. *Second Annual Report of the Governor of Porto Rico*, pág. 58, Washington, 1902. Aquéllos que fueron abolidos se incorporaron a los restantes. Luego se reinstalaron en municipios independientes los que habían sido abolidos con los mismos límites territoriales que antes tenían. Ley de 9 de marzo de 1905.

En el curso del tiempo se han modificado los límites territoriales de varios municipios existentes para crear nuevos municipios. En 1911 se creó el Municipio de Jayuya al separarse tres barrios del Municipio de Utuado. Ley Núm. 34 del 9 de marzo de 1911. En 1914 se separaron varios poblados de los municipios de Yauco, Fajardo y Humacao para constituir los de Guánica, Luquillo, Ceiba y Las Piedras. Ley Núm. 9 del 12 de marzo de 1914. En 1917 se separó de Juana Díaz el poblado de Villalba pasando éste a ser un municipio. Ley Núm. 42 del 12 de abril de 1917. En 1927 se constituyó el Municipio de Cataño mediante la segregación de dos barrios del de Bayamón. Ley Núm. 30 del 25 de abril de 1972. En 1951 se fusionaron los Municipios de San Juan y Río Piedras para constituir uno solo denominado San Juan Bautista. Ley Núm. 210 del 4 de mayo de 1951. En 1971 se separó el poblado de Loíza del Municipio de Canóvanas para formar un nuevo municipio. Ley Núm. 91 del 24 de junio de 1971. En 1971 se creó el Municipio de Florida al separarse dicho poblado del Municipio de Barceloneta. Ley Núm. 30 del 14 de junio de 1971.

Todos los cambios habidos en los límites territoriales de los municipios según hemos reseñado precedentemente han respondido a necesidades o conveniencias de carácter político o administrativo, y necesariamente han afectado la naturaleza del concepto tradicional de "vecindad". En la generalidad de los casos una "vecindad" ha pasado a ser más de una "vecindad" o una "vecindad" distinta. Así, por ejemplo, los

municipios de San Juan y Río Piedras que antes eran dos "vecindades" son ahora una sola. Y, el Municipio de Canóvanas que era antes una sola vecindad, al dividirse en dos municipios como consecuencia de la segregación del poblado de Loíza para constituir un municipio separado, adquirió el carácter de dos vecindades.

Si insistiéramos en la interpretación que hicimos del Art. 630 en *Rodríguez* v. *Rodríguez*, 62 D.P.R. 885 (1944), resultaría paradójico que los vecinos del poblado de Loíza que anteriormente podían utilizarse como testigos en el otorgamiento de un testamento en el municipio de Canóvanas, ya no podrían ser utilizados, por el mero hecho de que se trazara una línea imaginaria separando los habitantes de una y otra vecindad para fines exclusivamente políticos y administrativos. Así también, los vecinos de Río Piedras, antes de su anexión a San Juan, no podían ser testigos de un testamento otorgado en San Juan, sin embargo, luego de la anexión quedaron habilitados para serlo, todo ello como consecuencia de una ficción legal desvinculada de la esfera de la testamentaría.

En un momento de nuestra historia era lógico que el concepto de municipio se utilizara como definidor del concepto de vecindad del párrafo 2° del Art. 630 del Código Civil. El pobre estado de nuestras facilidades de comunicación redundaba en una escasa relación entre las comunidades municipios del país por la condición de aislamiento de unas respecto a las otras. Puerto Rico contaba, al momento del cambio de soberanía, con sólo 284 kilómetros de carreteras. *Second Annual Report of the Governor of Porto Rico*, pág. 38, Washington, 1902; Coll y Toste, C., *Reseña del Estado Social, Económico e Industrial de la Isla de Puerto Rico al tomar posesión de ella los Estados Unidos*, pág. 7, San Juan, 1899. Cada municipio representaba una comunidad cuyo desenvolvimiento giraba necesariamente en torno al núcleo municipal. Estas comunidades pequeñas se caracterizaban por la intensa

relación interciudadana con el resultado de que en la generalidad de los casos, los comunícipes se conocieran personalmente. El municipio puertorriqueño, además de ser un cuerpo político y administrativo, era una comunidad de integración social. Con base en esas circunstancias de naturaleza socioeconómica, nuestra decisión en *Rodríguez*, supra, eficazmente ayudaba a garantizar el requisito de conocimiento entre testador, testigos y notario que requiere el Art. 634 del Código Civil, 31 L.P.R.A. sec. 2150, y a facilitar el trámite de incidentes futuros que, con respecto al testamento, se suscitaran. Manresa, J. M., *Comentarios al Código Civil Español*, Tomo V, pág. 639, Madrid, 1972.

Hoy contamos con 7669.6 kilómetros de carreteras—treinta veces el número de kilómetros existentes al comienzo del siglo—y una variada red de comunicaciones que entrelazan nuestros pueblos. Departamento de Transportación y Obras Públicas, División de Estudios Especiales, *Kilómetros de carretera en Puerto Rico por tipo de superficie y sistema administrativo;* San Juan, 30 de junio de 1978. La integración de nuestras comunidades es realidad que vivimos cada día. En algunos casos es imposible determinar dónde termina un municipio y dónde comienza el próximo. Las construcciones de viviendas se suceden una después de otra en forma ininterrumpida, de suerte que en una "vecindad" pueden coincidir dos o más municipios. Ese es el caso de San Juan, Guaynabo, Cataño y Bayamón por un lado y de San Juan y Carolina por otro. La creciente movilidad de los habitantes de nuestra isla de los campos a los pueblos, y de los campos y pueblos a las ciudades, ha tenido como consecuencia el que se hayan proliferado en las ciudades núcleos de personas representativas de sus comunidades de origen. También se ha generalizado el que personas que residen en un municipio tengan sus trabajos en otros o lleven a cabo actividades comerciales, profesionales, culturales y sociales en pueblos distintos al que residen. De suerte que sus amigos, conocidos y rela-

cionados se encuentran dispersos a través de toda la Isla de Puerto Rico. Al igual que se mueve la actividad comercial, industrial y social de uno a otro extremo de la isla, testadores y notarios, acuden, según lo requieran sus particulares necesidades, a diversos lugares del país en actividades relacionadas con declaraciones de última voluntad. Es evidente que Puerto Rico se identifica hoy como una sola vecindad para múltiples propósitos, incluyendo el de la actividad testamentaria.

El devenir del tiempo, y con él la profunda huella del progreso, han causado que nuestra decisión en *Rodríguez*, supra, carezca hoy de utilidad social y de valor jurídico. El requerimiento de "vecindad" comprendido en el Art. 630 del Código Civil, que una vez equiparamos a "municipalidad", debe hoy interpretarse en el sentido de que los testigos instrumentales que comparezcan en el otorgamiento de un testamento sean, sin más, vecinos de nuestra Isla. Lo importante es que se cumpla con el requisito de conocimiento entre testador, testigos y notario del Art. 634 del Código Civil.

—O—

Opinión disidente en parte y concurrente en el resultado del Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 20 de marzo de 1979

De su faz el testamento abierto otorgado por don Flores Rivera Mercado en Aguadilla el 19 de agosto de 1973 ante el notario Jorge L. Chaar Cacho, por aparecer que los tres testigos instrumentales en aquel momento eran vecinos de San Sebastián, contraviene el Art. 630 del Código Civil preceptivo de que "no podrán ser testigos en los testamentos: (2) [l]os que no tengan la calidad de vecinos o domiciliados en el lugar del otorgamiento, . . . ." Dice así el texto del citado artículo:

(31 L.P.R.A. sec. 2146)—*Testigos, quiénes no podrán serlo.*
"No podrán ser testigos en los testamentos:

1. Los menores de edad.

2. Los que no tengan la calidad de vecinos o domiciliados en el lugar del otorgamiento, salvo en los casos exceptuados por la ley.

3. Los ciegos o los totalmente sordos o mudos.

4. Los que no entiendan el idioma del testador.

5. Los que no estén en su sano juicio.

6. Los que hayan sido condenados por el delito de falsificación de documentos públicos o privados, o por el de falso testimonio, y los que estén sufriendo pena de interdicción civil.

7. Los dependientes, amanuenses, criados, ni persona otra alguna que trabaje en la misma oficina, o sea socio, o pariente dentro del cuarto grado de consanguinidad o segundo de afinidad del notario autorizante."

El defecto apuntado tiene sanción de nulidad en el Art. 636 (31 L.P.R.A. sec. 2152) al prevenir que será nulo el testamento en cuyo otorgamiento no se hayan observado las formalidades respectivamente establecidas; y también en el Art. 4 (31 L.P.R.A. sec. 4) que declara nulos los actos ejecutados contra lo dispuesto en la ley, salvo los casos en que la misma ley ordene su validez. La Ley Notarial observa abstención en materia de testamentos y demás disposiciones mortis causa. (4 L.P.R.A. sec. 1022.)

La Sala de Aguadilla, contra su propio criterio y solo en respeto a precedentes adversos al mismo, anuló el testamento. El 11 de octubre de 1978 expedimos auto de revisión.

## I

La nulidad que la situación plantea no queda rebatida por argumentos geográficos en torno a la acrecentada fluidez del tránsito y comunicación entre pueblos, ni en los cambios operados en el desarrollo urbano y sistema vial de nuestra patria. Dichas facilidades, destacadas por el detalle de que en el 1898 Puerto Rico tenía 284 kilómetros de carreteras y hoy tiene 7670 kilómetros, si algo demuestran es que el notario de

hoy, con mucha más comodidad que el de ayer, puede guardar la ley y cumplir con el requisito de residencia de los testigos cuando el testador no esté avecindado en el municipio donde tiene abierta su notaría y prefiera sus vecinos de testigos, simplemente trasladándose(¹) al pueblo del domicilio del testador y otorgando allí, con los testigos compueblanos, la escritura de testamento abierto.

Carece de contenido jurídico el referido argumento sobre el urbanismo contemporáneo pues descansa en la premisa del desuso o cambio en la costumbre y hábitos de vida del puertorriqueño, opuestos a la letra de la ley. Dispone el Art. 5 del Código Civil que las leyes sólo se derogan por otras leyes posteriores; y que no prevalecerá contra su observancia el desuso, la costumbre, o la práctica en contrario. "De otro modo" comenta Castán Tobeñas,(²) "no se sabría nunca en qué momento la inejecución de una ley era bastante prolongada para destruirla."

La decisión de este Tribunal en *Paz* v. *Fernández*, 76 D.P.R. 742, 752–3 (1954), aun cuando precursora en su juridicidad, no es precedente para la dispensa del requisito de vecindad de testigos que ahora nos ocupa. Allí intentamos una clasificación de las formalidades o solemnidades por ley exigidas en los testamentos, distinguiendo entre las esenciales o de fondo, y las externas o de forma. No hubo concreción de doctrina toda vez que al sostener el testamento en *Paz*, supra, nos limitamos a rechazar señalamientos frívolos relacionados con la redacción del documento porque según la prueba en instancia todas las formalidades externas fueron cumplidas, y porque "[n]inguna formalidad de fondo, de las que vician de nulidad el testamento [estuvo presente ni], fue curada por

---

(¹) Con la profusión y dispersión de notarios en todo el territorio nacional debe inferirse que son contadísimos y de excepción los testamentos que requieran tal traslado, con el correspondiente aumento en costo para el testador.

(²) *Derecho Civil Español*, Tomo 1, Vol. 1°, págs. 449–450, 10ma. ed. (1962).

la prueba a que dio crédito el tribunal sentenciador." *Ibid.*, pág. 753.

Tampoco es convincente el ejercicio semántico tendente a establecer que los vecinos o domiciliados de San Sebastián lo son también de Aguadilla. Lo que define la vecindad es la convivencia en la unidad poblada: el barrio, el pueblo, la aldea, el sector, el ayuntamiento, por lo que no hay error en *Rodríguez* v. *Rodríguez*, 62 D.P.R. 885, 889 (1944), ni en *Arroyo* v. *Fernández*, 68 D.P.R. 514, 518 (1948), en cuanto identificaron el concepto "lugar del otorgamiento" con "Municipio" donde se constituye el notario para legalizar el acto. Sin salirnos de la Ley Notarial encontramos que su Art. 4 (4 L.P.R.A. sec. 1004) instruye que en caso de que el notario no pudiese atender su oficina nombrará como sustituto "otro notario que sea su *convecino*", voz ésta que la Academia define como "que tiene vecindad con otro en *un mismo pueblo.*" (Énfasis nuestro.) Sobre el particular dictamina Manresa "que el único criterio apreciable para fijar el concepto de vecino en estos casos, es el hecho de pertenecer al mismo municipio o término municipal." *Comentarios al Código Civil Español,* Tomo 5, pág. 625, 7ma. ed. (1972).

## II

A tenor del Art. 634([3]) del Código Civil (31 L.P.R.A. sec. 2150) los testigos del testamento cumplen dos funciones: identificación del testador pues dos de ellos por lo menos deberán conocerlo; y juzgar, con el notario, la capacidad legal

---

[3] Art. 634—*Notario y testigos deberán conocer al testador.*

"El notario y dos de los testigos que autoricen el testamento deberán conocer al testador, y si no lo conocieren, se identificará su persona con dos testigos que le conozcan y sean conocidos del mismo notario y de los testigos instrumentales. También procurarán el notario y los testigos asegurarse de que, a su juicio, tiene el testador la capacidad legal necesaria para testar.

"Igual obligación de conocer al testador tendrán los testigos que autoricen un testamento sin asistencia de notario, en los casos de las secs. 2187 y 2188 de este título." (31 L.P.R.A. sec. 2150.)

del testador necesaria para testar. Por razón de éstas y sus demás funciones pertinentes a la legitimidad de la disposición testamentaria, los testigos han de ser personas de capacidad intelectual, probidad e imparcialidad. La exigencia de ser vecino o domiciliado en el lugar de otorgamiento aparece tan desvinculada de aquellas cualidades esenciales, que motivó su eliminación([4]) del Art. 681 del Código Civil Español, que corresponde al 630 nuestro, *supra*. La generalidad de los tratadistas([5]) clasifican las causas de incapacidad para ser testigo testamentario en *absolutas*, que son las que inhabilitan una persona para intervenir en cualquier testamento, y *relativas*, que inhabilitan tan solo para los testamentos en que concurran determinadas circunstancias. Como corolario de este reconocimiento de distintos grados, índole y trascendencia de las formalidades del testamento concernientes a testigos, se ha impuesto la necesidad de templanza del rigorismo por la jurisprudencia, método de la equidad que va en auxilio de la legítima voluntad del testador manteniendo la validez formal de su testamento. No es este recurso nuevo de la jurisprudencia civil. Surge en el caso resuelto por sentencia de 30 de abril de 1909([6]) del Tribunal Supremo de España en la que discutiendo el requisito de vecindad de un testigo, se declara en el *primer considerando:* "... si bien a tenor de lo dispuesto en el art. 687 del Código Civil [Art. 636 P.R.] será

---

([4]) Por Ley de 1° de abril de 1939 que ordena:

"En los testamentos intervendrán los testigos exigidos por la legislación vigente, pudiendo los instrumentales ser a la vez testigos de conocimiento.

"No será necesario que los testigos tengan vecindad o domicilio en el lugar del otorgamiento, cuando aseguren que conocen al testador y el notario conozca a éste y a aquéllos." Scaevola, Tomo 12, 2da. ed. (1950), pág. 271.

([5]) Scaevola, *Código Civil*, Tomo 12, págs. 279–280; 2da. ed. (1950); Puig Peña, *Compendio de Derecho Civil Español*, Tomo 6, pág. 161; 3ra. ed. (1976); Castán Tobeñas, *op. cit.*, Tomo 6, Vol. 2, pág. 53 y ss.; Manresa, *op. cit.*, Tomo 5, pág. 627 y ss., 7ma. ed. (1972).

([6]) *Jurisprudencia Civil Núm. 88*, Tomo 114, pág. 672 y ss., ratificada por Sentencia de 5 de diciembre de 1909.

nulo el testamento en cuyo otorgamiento no se hayan observado las formalidades respectivamente establecidas, se impone, según regla de buen criterio, dada la naturaleza y significación de aquél, tener en cuenta la índole de dichas formalidades, para apreciar, con relación a su trascendencia, el límite dentro del cual pueden conceptuarse cumplidas, armonizando así la voluntad conocida de un testador con los requisitos externos de su expresión."

Esa atenuación del rigor de las solemnidades del testamento no es contradicción doctrinal, sino flexibilidad fundada en criterio de equidad, justificado por circunstancias especiales en que no se afecta de modo fundamental la sustancia del acto testamentario, como la que se da en el presente caso en que la residencia de los testigos en lugar distinto al de otorgamiento no produce conflicto con su capacidad intelectual, probidad e imparcialidad.

El Código Civil no establece quién pueda ser testigo sino que, por el contrario, hace lista de las incapacidades absolutas o relativas para el desempeño de esa función. La estimación de la incapacidad relativa de un testigo de testamento corresponde a los tribunales que al ejercitar su arbitrio no deben preferir, sin distinguir de casos y circunstancias, la severidad del precepto legal interpretado, menos necesario ese rigor de ritualidad hoy que antes, "si" como declara el Tribunal Supremo español, "se tiene en cuenta el alto nivel de aptitud profesional y reconocida [garantía] de la fe pública." Sentencia de 27 de mayo de 1914.(⁷) Hay que tener presente que aunque por la generalidad y amplitud conceptual de sus términos tan brevemente expresados, parece que la sanción de nulidad del Art. 636 es tan absoluta que ni el más insignificante requisito queda excluido de ella, bastando su falta para viciar fatalmente el acto, sin embargo, su precepto se refiere y limita, como señala la jurisprudencia, a aquellas formali-

_____

(⁷)*Jurisprudencia Civil, Núm. 80*, Tomo 130, pág. 390 y ss.

dades que puedan afectar la esencia y validez del otorgamiento.

Con estos antecedentes y fundamentos sostengo la validez del testamento impugnado, y consecuentemente la sentencia de instancia debe ser, revocada.