MICHAEL I., BARBARA FRANCES y GLORIA, todos de apellidos RODRÍGUEZ SARDENGA, demandantes y recurrentes, *v*. ANDREA SOTO RIVERA, por sí y como madre con patria potestad de los menores BRENDA y GAY de apellidos RODRÍGUEZ SARDENGA, demandados y recurridos; WILSON F. COLBERG, tercero demandado.

*Número:* R-78-308      *Resuelto:* 25 de mayo de 1979

*J. Martín Almodóvar Acevedo* y *Luis R. Torres,* abogados de los recurrentes; *A. Valentín Adames,* abogado de la parte recurrida; *Wilson F. Colberg,* por derecho propio.

### SENTENCIA

Por hallarse el Tribunal igualmente dividido, se confirma la sentencia recurrida.

Así lo pronunció y manda el Tribunal y certifica el Secretario. El Juez Asociado Señor Martín emitió opinión a la que se unen los Jueces Asociados Señores Torres Rigual y Negrón García; el Juez Asociado Señor Díaz Cruz emitió opinión a la que se unen los Jueces Asociados Señores Rigau e Irizarry Yunqué, quien además emitió voto particular; y el Juez Asociado Señor Negrón García emitió opinión a la que se unen los

Jueces Asociados Señores Torres Rigual y Martín. El Juez Presidente Señor Trías Monge se inhibió y el Juez Asociado Señor Dávila no intervino.

(Fdo.) Ernesto L. Chiesa

*Secretario*

—O—

Opinión emitida por el Juez Asociado Señor Martín a la cual se unen los Jueces Asociados Señores Torres Rigual y Negrón García.

San Juan, Puerto Rico, a 25 de mayo de 1979

Aunque me he unido a la opinión emitida por el compañero Juez Asociado Señor Negrón García, que sostiene la validez del testamento objeto de este recurso, deseo hacer una expresión separada.

Los demandantes recurrentes señalan, en pleito que han entablado sobre nulidad de testamento, que el notario que autorizó el testamento de su causante, cometió cuatro errores formales en su redacción y otorgamiento, que a su juicio vician de nulidad el instrumento.[1] Sostienen que el notario (1) no dio fe de que a su juicio y al de los testigos instrumentales que comparecieron dicho causante tuviera la capacidad necesaria para testar, (2) no expresó la hora del otorgamiento, (3) no consignó haber leído dicha escritura en alta voz, y (4) utilizó testigos no avecinados en el lugar del otorgamiento. El tribunal a quo dictó sentencia sumaria ratificando la validez del testamento. No conforme, los demandantes acuden ante nos en revisión.

El testamento, como acto eminentemente formal y solemne, requiere, so pena de nulidad, que sus respectivas formalidades sean siempre observadas, y ello, aunque no haya duda

---

[1] Los herederos demandantes en este pleito no impugnan la capacidad legal de su causante para testar.

alguna racional de que lo consignado en el mismo sea fiel expresión de la voluntad del testador. J. Castán Tobeñas, *Derecho Civil Español, Común y Foral*, Tomo 6, Vol. II, pág. 21, Madrid, 1973. De esa manera, el legislador reconoce la importancia extraordinaria del acto jurídico que constituye el otorgamiento de disposición testamentaria, y ha procurado revestirlo de múltiples y minuciosas formalidades en garantía de su veracidad y eficacia. Ahora bien, no ha sido el ánimo del legislador que para hacer constar los requisitos externos del testamento, vengan los notarios obligados a sujetarse a la forma y vocablos usados en los preceptos de la Ley. J. Ma. Manresa, *Comentarios al Código Civil Español*, Tomo V, pág. 676, Madrid, 1972; Sentencia del Tribunal Supremo de España de 11 de febrero de 1929.

## I

Con estos principios en mente, expresamos en *Paz* v. *Fernández*, 76 D.P.R. 742, 749 (1954), que al dar fe el notario sobre la capacidad que le demuestra el testador, en cumplimiento con las disposiciones del Art. 645 del Código Civil, no está obligado a emplear las mismas palabras que utiliza el Código "pudiendo usar otras distintas que indiquen la misma idea." Me refiero al primer error señalado. En el caso de autos, el texto utilizado por el notario autorizante para acreditar la capacidad del testador ofrece particular complicación, puesto que ha utilizado una frase que en nuestro sistema jurídico puertorriqueño es objeto de varios significados, que pueden quedar aclarados luego de un cuidadoso análisis, evitando así que pueda dar la impresión de que no manifiesta adecuadamente el juicio de la capacidad del testador que debe consignar el notario en la escritura de testamento. El texto utilizado por dicho notario en la escritura objeto de impugnación es el siguiente:

"Me asegura hallarse en el pleno goce y ejercicio de sus *derechos civiles* y teniendo a mi juicio y al de los testigos instrumen-

tales que se mencionarán más adelante y quienes me aseguran conocer al compareciente, oírle, verle y entenderle, ordena y formaliza su última voluntad bajo los hechos y declaraciones siguientes:" (Énfasis nuestro.)

El concepto "derechos civiles" tiene en la tradición civilista en que se enmarca nuestro sistema de derecho, un significado distinto del que tiene en el derecho constitucional, y en la legislación norteamericana, habiéndose definido por ejemplo en una obra de derecho civil con concreción y claridad de la siguiente manera:

"DERECHOS CIVILES. Los naturales o esenciales de los cuales goza todo individuo jurídicamente capaz. El principio lo constituye que todo habitante del Estado, mayor de edad y en su sano juicio, tiene la suma de los *derechos civiles,* los reconocidos por las leyes de este carácter; pues salvo raras excepciones puede contratar, testar, contraer matrimonio, etc." G. Cabanillas, *Diccionario de Derecho Usual,* 5ta. ed., Tomo I, pág. 661, Madrid, 1962.

Ver además *Enciclopedia Jurídica Española,* Tomo II, pág. 321 y autoridades citadas en la ponencia del Juez Asociado Señor Negrón García. A mi juicio, la frase "Derechos civiles" describe en nuestra tradición de derecho civil, aquéllos concedidos a los habitantes de un Estado por las leyes civiles que allí rigen, que en nuestro orden provienen principalmente del Código Civil. El concepto civilista se refiere, en esencia, a facultades de disposición, de determinación del estado personal, etc. Por ello, la frase "el pleno goce y ejercicio de los derechos civiles" comprende "la suma" de estos derechos que supone necesariamente, la mayoría de edad y la sanidad del juicio que son elementos distintivos de la capacidad para testar, según el Art. 612 del Código Civil, 31 L.P.R.A. sec. 2112.

La confusión que puede haber en el significado de la frase "derechos civiles" surge por la influencia directa del derecho norteamericano en nuestro medio al catalogar en esa forma lo que en efecto son los "derechos individuales" de los ciuda-

danos, derivados de la Constitución de los Estados Unidos, cuyo significado rige aquí por analogía respecto a los derechos provenientes de la Constitución del Estado Libre Asociado de Puerto Rico. En España, sin embargo, el término equivalente al mencionado es el de "derechos individuales", el que define el citado autor Cabanillas como "las garantías que las Constituciones conceden a favor de todos los habitantes del Estado, . . . un conjunto de *derechos* de los cuales no cabe privar al individuo sino excepcionalmente, con arreglo a la ley expresa." G. Cabanillas, *op. cit., loc. cit.* De insistir en el significado norteamericano de la frase crítica "derechos civiles", que hemos también adoptado en nuestra legislación y aun en nuestra jurisprudencia,[2] podría entenderse que dicho concepto queda limitado a los derechos constitucionales.

Mas siendo la testamentaría una actividad de naturaleza privada, regida plenamente por el Código Civil, deben conformarse las frases contenidas en los documentos con ella relacionados, con los conceptos que distinguen ese orden y no con las ideas propias de otras áreas del ordenamiento jurídico. Debe considerarse, por tanto, que cuando el notario autorizante usó el término "derechos civiles" en el testamento que nos ocupa lo usaba en la acepción que se le confiere en el derecho civil y no en el constitucional.

Aceptando la corrección del término "derechos civiles" para significar la suma de éstos reconocidos por las leyes civiles que comprenden la capacidad de contratar, testar, contraer matrimonio, etc., debemos ver si el notario dejó sentado que el testador gozaba de dichos derechos a su juicio y al de los testigos del otorgamiento. El notario expresa primeramente que el testador le asegura hallarse en el pleno goce y

---

[2] En *Pierson Muller I* v. *Feijoó*, 106 D.P.R. 838 (1978), denominamos "Ley de Derechos Civiles de Puerto Rico" a la Ley Núm. 12 de 8 de agosto de 1974, 32 L.P.R.A. sec. 3524, que enmendó el Art. 678 del Código de Enjuiciamiento Civil, y señalamos que tiene "raíz filosófica y filológica en 42 U.S.C. sec. 1983" y que su propósito es la "vindicación del derecho del individuo frente al Gobierno."

ejercicio de sus derechos civiles. Acto seguido dice "y *teniendo* a mi juicio y al de los testigos instrumentales . . . quienes me aseguran conocer al compareciente, oírle, verle y entenderle." (Énfasis nuestro.) El vocablo clave es el gerundio "teniendo". Cabe preguntarse ¿a qué se refiere "teniendo"? Una de las acepciones del verbo tener es "poseer y gozar." Real Academia Española, *Diccionario de la Lengua Española*, 9na. ed., pág. 1254, Madrid, 1970. Comoquiera que "teniendo" es la forma adverbial del verbo tener, que también significa "poseyendo y gozando", no puede referirse a la idea que sigue en el texto del párrafo en que se pretende acreditar la capacidad del testador, o sea, a que el testador "ordena y formaliza su última voluntad", lo que no haría ningún sentido. Forzosamente pues, tiene que referirse a la idea que le precede, esto es, al "pleno goce y ejercicio de sus derechos civiles." Siendo la interpretación más lógica la de que el testador a juicio del notario y al de los testigos instrumentales "tiene" o lo que es lo mismo "goza y posee" "el pleno goce y ejercicio de sus derechos civiles", ello equivale a expresar que el testador está en su sano juicio y por ende con capacidad para testar. Naturalmente que si el notario hubiese sido más cuidadoso al cotejar el texto habría notado la falta del sufijo "lo" que es el pronombre que se junta al verbo y forma una sola palabra para denotar que se refiere al testador, no hubiese dado lugar a la impugnación del testamento por la razón señalada. Concluyo por tanto que el notario quiso decir "teniéndolo" y no "teniendo", cumpliendo así con el requisito de que a su juicio el testador tenía capacidad para testar según lo requiere el Art. 645 del Código Civil.

## II

Tampoco coincidimos con el recurrente cuando sostiene que la expresión en manuscrito de la hora del otorgamiento que colocó el notario al final de la escritura es insuficiente ya que aunque estuvo seguida de su firma, no se repitió en ella la tradicional dación de fe escrituraria.

Cierto es, como bien señala la opinión del compañero Juez Asociado Señor Díaz Cruz, que cuando un notario firma un documento como testigo no imparte con su firma la fe notarial. Mas no es ese el caso de autos en que el notario autorizante no podía actuar en otra forma que no fuera la de notario al estampar su firma luego de la adición que hizo al efecto, la cual fue seguida por la firma del testador, de los testigos y otra vez la del notario.

Una firma puede significar que el firmante es autor del contenido o material de un documento o de la literalización que éste contiene, cuya labor de literalización puede tener un simple alcance instrumental, pero también "puede ir revestida de una especial trascendencia jurídica, si quien literaliza lo hace amparado en la fe pública, o sea, gozando de unas prerrogativas autenticadoras que proporcionen al documento la categoría de documento público, con todas las consecuencias que de ello se derivan." *Nueva Enciclopedia Jurídica*, Tomo IX, pág. 837, Barcelona, 1958. Ante tan clara exposición, no debemos albergar dudas sobre el hecho de que la firma del notario inmediatamente después de la adición crítica, no tuvo otro efecto que certificar con la fe que es función de su ministerio la aseveración que acababa de consignar. Con ello queda cumplida la dación de fe que exige el acto notarial.

### III

En cuanto a la ausencia de la expresa manifestación en la escritura de que la misma se leyera en alta voz, basta con recordar, como bien señala la opinión del compañero Juez Asociado Señor Negrón García, cuanto dijimos en *Paz* v. *Fernández*, 76 D.P.R. 742, 750–751 (1954), a los efectos de que dicha omisión queda subsanada al certificar el notario haber cumplido con todas las formalidades requeridas por la Sección quinta, Capítulo primero, Título tercero, del Libro tercero del Código Civil. Igual posición sustentan el Tribunal Supremo de España desde el 6 de abril de 1896, y la científica doctrina.

J. Castán Tobeñas, *Derecho Civil Español, Común y Foral,* Tomo 6, Vol. II, págs. 96–97, Madrid, 1973. J. Ma. Manresa, *Comentarios al Código Civil Español,* Tomo V, págs. 674–675, Madrid, 1972.

## IV

Y en cuanto al problema de la vecindad de los testigos, nuestra reciente decisión en *Rivera Pitre* v. *Galarza Martínez,* 108 D.P.R. 565 (1979), dejó resuelto que la vecindad requerida no se refiere a vecinos del mismo municipio del otorgamiento.

No obstante mi conclusión en el sentido de que el testamento objeto de este recurso debe sostenerse, considero mi deber ineludible hacer unos comentarios sobre la gran responsabilidad que asumen los notarios en el otorgamiento de testamentos ante la ley, ante el testador y ante las partes afectadas por la disposición testamentaria.[3] Es evidente que el notario autorizante que participó en este caso incurrió en omisiones que tomadas en conjunto reflejan una actitud poco celosa y descuidada en el desempeño de su delicada función notarial que arriesgaron la validez del testamento conforme lo demuestra la igual división de este Tribunal. Primeramente, al haber utilizado fraseología, en nuestro medio confusa, para expresar la impresión de capacidad del testador para testar, unido a la omisión del pronombre "lo" en la forma verbal "teniendo"; segundo, el uso de testigos de distinta vecindad municipal, contrario a la interpretación entonces vigente sobre ese aspecto; tercero, el no haber expresado con claridad el haber leído el testamento en alta voz ante el testador y los testigos; y por último, el haber hecho expresión de

---

[3] Ningún notario puede excusar su desidia, flaqueza, imprudencia o abandono por razón de que haya sido otro notario quien preparó el documento que ante aquél se otorga. Tampoco puede justificar sus actos bajo la alegación de que sus servicios fueron ofrecidos gratuitamente o accediendo al ruego de un compañero abogado. Su responsabilidad ante la ley es personalísima.

la hora en que se otorgó el testamento luego de la dación general de fe.

El insigne notario y comentarista español, don Juan Vallet de Goytisolo caracteriza como función concreta y específica del notario de nuestro medio jurídico el prevenir, precaver, *cavere*. Esa cardinal tarea notarial, según él, se desdobla en dos fundamentales aspectos: como profesional del Derecho mediante la misión de asesorar a quienes reclaman su ministerio y aconsejarles los medios jurídicos más adecuados para el logro de los fines lícitos que aquéllos se proponen alcanzar; y como funcionario público a través del ejercicio de la fe pública (1) en la esfera de los hechos, para fijar la exactitud de los que el notario ve, oye, o percibe con sus sentidos, y (2) en la esfera del derecho, para investir de autenticidad y fuerza probatoria las declaraciones de voluntad de las partes en el instrumento público redactado conforme a las leyes, en cuantas relaciones de derecho privado *traten de establecer sin contienda judicial.* J. Vallet de Goytisolo, *La Misión del Notario,* en XVI Revista de Derecho Notarial, pág. 393 *et seq.* (1957).

En el notario de hoy, dice el citado comentarista, coinciden pues dos funciones otrora dispersas. De la tradición griega, la consecución de la autenticidad, y de la romana, la corrección y exactitud sustancial del negocio.

Mal sirve el notario a la sociedad y pobre imagen proyecta de sí cuando negando su función previsora, y las insignes tradiciones que su profesión ostenta, con su descuido nubla los actos jurídicos, haciendo necesaria la intervención judicial. Tal función cobra mayor trascendencia en la testamentaría, y por ello el Código Civil impone responsabilidad al notario en los casos en que se declara la nulidad de un testamento abierto por no haberse observado las solemnidades establecidas. Art. 655 del Código Civil, 31 L.P.R.A. sec. 2202. En esos casos el notario autorizante es responsable de los daños y per-

juicios que sobrevengan, si la falta procediere de su malicia o negligencia o ignorancia inexcusable. *Id.*

La función que descarga el notario en el otorgamiento de testamentos abiertos es en extremo delicada, especialmente en circunstancias en que el testador está en frágil estado de salud. Debe asegurarse, por tanto, y así debe expresarlo con entera certeza, de que el testador, a su juicio y al de los testigos instrumentales tiene la capacidad legal necesaria para testar. En esa pulcra misión, que muchas veces se realiza en el secreto de una alcoba, el notario contrae una obligación legal tanto con los presentes como con los ausentes quienes depositan su fe y confianza en que el notario, en el desempeño cabal de su función, ha de ser puntilloso en la observancia estricta de las formalidades establecidas por la ley en el otorgamiento de testamentos.

—O—

Opinión del Juez Asociado Señor Díaz Cruz a la que se unen los Jueces Asociados Señores Rigau e Irizarry Yunqué.

San Juan, Puerto Rico, a 25 de mayo de 1979

El testador Miguel Angel Rodríguez Moreno otorgó testamento abierto el 4 de septiembre de 1974 en su lecho de enfermo en el Hospital Metropolitano, padeciendo de cáncer pulmonar, donde sobrevino su muerte siete días después, o sea, el 11 de septiembre de 1974. El testamento aparece otorgado en la escritura Núm. 27 de la primera fecha, en San Juan, ante el notario Wilson F. Colberg.

Los tres hijos del primer matrimonio, limitados en la disposición testamentaria a su participación en la legítima estricta, instaron demanda de nulidad de testamento contra dos medio hermanos y la viuda del testador favorecidos en la institución con el restante balance de la herencia. Los demandantes impugnaron la validez del testamento por defectos de forma que conllevan la nulidad del mismo, consistentes en violación del Art. 645 del Código Civil, que dicta el modo de

otorgar testamentos, en tres de sus requisitos normativos, a saber: (a) no haber el notario hecho constar que a su juicio se hallare el testador con la capacidad legal necesaria para otorgar testamento; (b) no contener el testamento expresión de la hora en que se otorgó; y (c) no haberse leído en alta voz por el notario. Alegaron como causas adicionales de nulidad (d) la contravención del Art. 630 (2) por no tener los testigos condición de vecinos del lugar de otorgamiento; y formularon la alegación genérica de (e) no cumplir el testamento con las formalidades de ley requeridas.

Los demandantes solicitaron sentencia sumaria a su favor y a pesar de la patente e insalvable presencia de los defectos (a) y (b) la sala de instancia abrió el pleito a la presentación de declaraciones juradas y demás documentos, asumiendo que podía refutarse lo irrebatible, y aparentemente en la creencia de que los señalados vicios o deficiencias son subsanables con prueba extrínseca. Finalmente, no sólo desestimó la solicitud de sentencia sumaria de los demandantes, sino que cerró el juzgado y les negó todo derecho a vista, dictando sentencia sumaria por la que desestimó la demanda. Al recurso de revisión de los demandantes, el 11 de septiembre de 1978 expedimos el auto.

I

El testamento, a diferencia de los contratos, es un acto cuya validez y fidelidad a lo ordenado no podrán ser ni sostenidas ni cuestionadas por el otorgante único que lo es el testador, toda vez que su muerte y con ella la extinción irreversible de su testimonio como fuente de clarificación de lo actuado, es lo que imparte vigencia al testamento. Fue ante la universal premisa del imperturbable silencio de la muerte[1]

---

[1] "Lo decisivo es que la expresión de la última voluntad no adquiere fuerza jurídica hasta después del fallecimiento del causante. Éste no está ya en situación de exponer cuál era su verdadera y seria última voluntad, ni de aclarar la declaración que emitió. Ha desaparecido, por tanto, el único testigo clásico que puede darse en este asunto. Si no existe docu-

que se desarrolló el concepto de testamento como negocio jurí-
dico solemne en el que deberán observarse unas formalidades,
requisitos y condiciones que le impartan al documento en que
se consigna la última voluntad, el valor probatorio que en el
orden procesal se le reconoce a los testimonios admitidos en
evidencia. La integridad del acto de disposición mortis causa
descansa fundamentalmente en el cumplimiento de las solem-
nidades ordenadas en el Código Civil, faltando las cuales dará
lugar al severo dictamen del Art. 636 del Código Civil 31
L.P.R.A. sec. 2152: será nulo el testamento en cuyo otorga-
miento no se hayan observado las *formalidades* respectiva-
mente establecidas en este Capítulo (217).

El testamento que es en sí evidencia de lo ordenado por el
testador respecto a sus bienes ha de ser suficiente en los ele-
mentos constitutivos de esa prueba y en los extremos funda-
mentales de la misma, sin que pueda su ausencia suplirse con
evidencia *aliunde,* la que sirve la función limitada de aclarar
ambigüedades en la disposición mortis causa. El Art. 624 no
limita los elementos de interpretación al texto del testamento.
La admisión de medios extrínsecos en supuestos de *inadecua-
ción o insuficiencia expresivas* está confirmada por los Arts.
702 y 801 (4) del Código Civil.

En los testamentos la fidelidad a la forma dispuesta por
ley es elemento vital ineludible. Castán Tobeñas (²) resume la
jurisprudencia así: "El Tribunal Supremo, confirmando el
carácter solemne del testamento y la doctrina del artículo 687,
ha declarado reiteradamente: que en ningún caso la voluntad
conocida de un testador basta por sí sola para reputarla como
disposición testamentaria si no resulta expresada en la ma-

---

mento alguno, sólo queda el testimonio de otras personas." Enneccerus,
Kipp, Wolff (Roca Sastre), *Tratado de Derecho Civil,* Tomo 5, Vol. 1, pág.
205, 2da. ed., 1976.

". . . [E]n las disposiciones por causa de muerte rige necesidad de
forma y no libertad de forma, . . . ." pág. 206, *ibid.*

(²)*Derecho Civil Español,* Tomo 6, Vol. II, págs. 422–423, 7ma. ed.,
1973.

nera y con los requisitos exigidos por la ley (sentencias de 30 de noviembre del año 1906, 9 de marzo de 1908 y 30 de septiembre de 1911) ; que la omisión de alguna de las solemnidades y reglas establecidas para otorgar testamento vicia de nulo el acto, siendo errónea y muy peligrosa la teoría de que lo único esencial es que conste la voluntad del testador cuando aparezca convenientemente expresada y ratificada por él (sentencia de 18 de noviembre de 1915) ; que la omisión de las solemnidades que requiere la ley para la validez de los testamentos no es dable suplirla por los medios ordinarios que sirven para acreditar las de otros otorgamientos (sentencia de 7 de junio de 1923), y que es necesario que las formalidades sean observadas como garantía de la realidad del testamento, dada la trascendencia jurídica de este acto (sentencias de 10 de julio de 1944 y 4 de enero de 1952)."

Esta doctrina, aceptada por los tratadistas, sin disenso entre ellos, pues reconocen que "la validez del testamento, como la de todos los actos jurídicos, depende de la observancia de la ley que los regula" y que aun cuando el Art. 636 habla de *formalidades*, "no debe entenderse circunscrito su precepto a las meras ritualidades de forma, sino que se ha empleado dicha palabra en el concepto de las *solemnidades* todas del testamento, pues como tiene declarado el Tribunal Supremo, el Código no distingue entre unas y otras, sino que, indistintamente, usa ambas denominaciones como sinónimas, por referirse las dos a la forma o modo de hacer el otorgamiento." (3) (Énfasis en el original.)

(3) Manresa, *Comentarios al Código Civil Español*, Tomo 5, pág. 670, 7ma. ed., 1972; Ossorio Morales, *Manual de Sucesión Testada*, págs. 466–67, ed. 1957; Castán Tobeñas, *supra;* Puig Brutau, *Fundamentos de Derecho Civil*, Tomo 5, Vol. II, pág. 45 y ss., ed. 1977; Borrell y Soler, *Derecho Civil Español*, Tomo 5, pág. 15, ed. 1954; Diego Espín, *Manual de Derecho Civil Español*, Vol. 5, pág. 372, 3ra. ed.; Bonet Ramón, *Compendio de Derecho Civil*, Tomo 5, págs. 238–239, ed. 1965; Puig Peña, *Tratado de Derecho Civil Español*, Tomo 7, pág. 200 y ss., ed. 1976; Scaevola, *Código Civil*, Tomo 12, pág. 361, 2da. ed.

Si desechamos la forma en busca de nuestra idea de una distribución justa del caudal, remitiremos la testamentifacción activa a las arenas movedizas donde sucumbirán la certeza y la confianza en la corrección documental, caeremos en una casuística interminable, afectada de inseguridad y arbitrariedad. La interpretación del testamento tiene la forma como centro de gravedad, y el tribunal no debe desviarse de lo que está claramente exigido por ley. Pierde majestad el Derecho que a cada paso requiere una complicada retórica para exponerlo y más aún si la dialéctica o jerga lo aparta de la ley.

## II

Este testamento, por la profusión de sus defectos, es inconciliable con la sensibilidad jurídica general. Examinemos su precaria anatomía.

(a) Falta de expresión afirmativa sobre la capacidad del testador.

En terso precepto, ordena el Art. 645 del Código Civil, 31 L.P.R.A. sec. 2182:

"El notario hará siempre constar que, a su juicio, se halla el testador con la capacidad legal necesaria para otorgar testamento."

Añade el Art. 634 que tanto el notario como los testigos procurarán asegurarse de que, "a su juicio, tiene el testador la capacidad legal necesaria para testar"; y especifica el Art. 615 que para apreciar la capacidad del testador se atenderá únicamente al estado en que se halle al tiempo de otorgar el testamento. Son estos requisitos de estricto cumplimiento, cuya inobservancia conlleva la sanción especial de nulidad del Art. 636, 31 L.P.R.A. sec. 2152:

"Será nulo el testamento en cuyo otorgamiento no se hayan observado las formalidades respectivamente establecidas en este Capítulo." (217)

y la de mayor universalidad consignada en el Art. 4 del Título Preliminar, 31 L.P.R.A. sec. 4:

"Son nulos los actos ejecutados contra lo dispuesto en la ley salvo los casos en que la misma ley ordene su validez."

En el testamento bajo revisión el notario omitió toda mención de la capacidad del testador, limitándose a una alusión extemporánea a sus "derechos civiles" con el siguiente lenguaje:

—Doy fe de conocer personalmente al compareciente y también la doy de sus circunstancias personales con relación a su dicho. Me asegura hallarse en el pleno goce y ejercicio de sus derechos civiles y teniendo a mi juicio y al de los testigos instrumentales que se mencionarán más adelante y quienes me aseguran conocer al compareciente, oírle, verle y entenderle, ordena y formaliza su última voluntad bajo los hechos y declaraciones siguientes . . . ."

En *Paz* v. *Fernández*, 76 D.P.R. 742 (1954), que es *tabula in naufragio* de la sentencia sumaria recurrida, expresamos que el notario no está obligado a emplear las mismas palabras del Art. 645, pudiendo usar otras distintas que indiquen la misma idea, al sostener la validez y suficiencia de una cláusula en que el notario aseguraba el libre uso por el testador de sus facultades intelectuales[4] y "capacidad legal necesa-

---

[4] La cláusula impugnada en *Paz* v. *Fernández*, supra, dice así:
"Doy fe del conocimiento personal del compareciente, y por sus dichos, de su edad, estado, profesión y vecindad. Me asegura tener el libre uso de sus facultades intelectuales, habla expedita y capacidad legal necesaria para disponer su testamento, como así parece a juicio de tales testigos y de mí, el Notario; . . . ." *Ibid.* pág. 748.

En *Paz*, supra, nos solidarizamos con la doctrina prevaleciente sin reservas, al dictaminar a las págs. 751–752.

"Cierto es, como sostienen los apelantes, y como nos expresamos en *Ex parte Planis* v. *Pueblo*, 42 D.P.R. 689, 691, que la forma de testamentos es algo solemne creado por el estatuto. Si no se siguen las formalidades de ley no tiene validez el testamento. Tales formalidades no son meras cuestiones de evidencia, sino requisitos substantivos. Sin estos requisitos no hay testamento."

Y a la pág. 753 sostuvimos que los vicios en las formalidades de fondo hieren de nulidad el testamento y no son curables con prueba.

ria para disponer testamento." Compárese esta plenitud de expresión en lo que concierne a capacidad para testar, con la esterilidad y la fragmentación lexicográfica de la que ahora nos ocupa. En ésta no se usan ni las palabras del Código, ni ninguna otra que pueda trasmitir noción sobre la capacidad del testador. Ninguna paz brinda el citado caso al testamento de Miguel Angel Rodríguez Moreno.

La alusión en el testamento al "pleno goce y ejercicio [o disfrute] de sus derechos civiles" es residuo documental de la época en que existía el castigo de la interdicción civil como parte de la pena en determinados delitos. Aparte de no ser más que un anacronismo retórico la frase nunca ha sido equivalente o sustituto de la expresión por el notario, exigida por el Art. 645, de hallarse el testador con la capacidad legal necesaria para testar. El concepto de "pleno goce y ejercicio" de los derechos civiles no comprende necesariamente la facultad o capacidad para testar. La sala de instancia en irrestricta ortopedia, erró al considerar suficiente lo que a todas luces es crasa omisión de toda constancia en cuanto a la capacidad del testador, extendiendo su lectura del documento hasta el punto de resolver que "cuando el notario dijo 'teniendo' quiso decir 'teniéndolo', lo cual se debió a un error clerical." (Opinión pág. 10.)

Por la distinción conceptual entre "derechos civiles" y "capacidad para testar" ni aun la insostenible modificación del texto mediante adición de la partícula "lo" reivindica lo que resulta ser un testamento herido de nulidad que por la gravedad de su vicio sólo puede clasificarse como testamento *inexistente.*

Un elector puede hallarse en "pleno goce y ejercicio" de su derecho al sufragio, mas no será un elector capacitado si se presenta a votar en un precinto donde no está inscrito. Cualquier persona puede hallarse en "pleno goce y ejercicio"

de su derecho a testar, mas no podrá hacerlo si al tiempo de otorgar testamento sufre transitoria o momentánea pérdida de su capacidad intelectiva y anímica. De ahí la exigencia del Art. 615,. *supra*, de que al apreciar la capacidad del testador se atenderá únicamente al estado en que se halle al momento de otorgar el testamento. Si el elector "en ejercicio" de su derecho al sufragio vota donde no está inscrito, sufrirá la anulación de su voto. Igual consecuencia espera al testamento otorgado por quien *ejercita* su derecho a testar en momento en que carece de claridad mental, esencia de la *capacidad*.

El "pleno goce y ejercicio" de los derechos civiles es facultad inalienable y permanente de la persona que le acompaña desde la cuna hasta la tumba, que no se afecta ni con la minoridad ni la locura, pues el padre o el tutor completarán la personalidad para reclamarlos. Por el contrario, la capacidad para testar es cualidad exigida en el momento de otorgamiento, que se pierde por enfermedad mental temporera o permanente, e indelegable por ser acto personalísimo (Art. 619). La cláusula discutida, ni con ayuda retórica trasmite una semblanza de afirmación de capacidad para testar.

La interpretación del testamento no se extiende a incluir lo no dicho, y a dar por cumplido lo omitido. La formalidad esencial que imparte validez al testamento abierto no escapa a la norma del Art. 624, 31 L.P.R.A. sec. 2129, que ordena entender toda disposición testamentaria en el sentido literal de sus palabras. La ley es la fuente de derecho, primera en orden jerárquico, y la jurisprudencia en su misión de complementar el ordenamiento jurídico ha de moderar la interpretación con sentido de lealtad a la norma legislada. En su deber inexcusable de atenerse al sistema de fuentes del ordenamiento jurídico integrado por la ley, la costumbre y los principios generales del derecho, los jueces y tribunales han de mantener la eficacia de la legislación y el principio de que "los actos contrarios a las normas imperativas y a las prohibitivas son

nulos de pleno derecho, salvo que en ellas se establezca un efecto distinto para el caso de contravención." (5)

El testamento de Miguel Angel Rodríguez Moreno es contrario a las normas imperativas relativas a la capacidad del testador.

El testamento es un acto formal o solemne y la voluntad expresada de otra manera no tiene valor ante la ley, "puesto que la forma es esencial en este caso al acto jurídico al haberla impuesto el legislador." Valverde, *Tratado de Derecho Civil Español*, Tomo 5, pág. 144, 4ta. ed., 1939. Esta primacía de la solemnidad en la forma imperativa del testamento aparece sintetizada en ponencia del magistrado don José Castán, del Tribunal Supremo de España, así: "Considerando que es uno de los dogmas fundamentales de la sucesión mortis causa que la forma es esencial al acto testamentario, el cual, para que tenga existencia jurídica y produzca sus efectos propios, ha de ajustarse rigurosamente a las solemnidades establecidas por la ley como garantías de la libre manifestación de la voluntad del testador y de su segura conservación y prueba, y si bien la propia ley, para proveer a necesidades extraordinarias, establece formas especiales y simplificadas, mediante las que se facilita la expresión de la última voluntad a ciertas personas y en determinadas circunstancias, el uso de tales formas está subordinado a la concurrencia de los supuestos y requisitos previstos para cada una de ellas, sin que sea lícito sustituir unos por otros a virtud de la aplicación de pretendidos criterios de analogía." Sentencia de 10 de julio de 1944.

Para fijar el sentido de la jurisprudencia acerca del criterio de nulidad de los testamentos en la interpretación y aplicación del importante Art. 636 relacionado con los 634 y 635, "son de singular valía ciertos pasajes de la Memoria elevada

---

(5) Principio incorporado en el Art. 6.3, Título Preliminar del Código Civil Español, según redactado en 1974 (Novena Edición oficial, 1975).

por la Presidencia de la Sala de lo civil del Tribunal Supremo en 1901, al Gobierno, en la que se lee:

'No se puede desconocer, pues la experiencia de multitud de casos sometidos a los Tribunales lo revela, que en muchos de ellos se luchó por los particulares con el convencimiento de que se defiende la voluntad conocida del testador, pretendiendo subordinar a esta voluntad conocida, reglas de formalidad establecidas, precisamente, para garantirla, no siendo raro que alguna vez haya influido en los mismos Tribunales tal consideración para decidir la cuestión de validez que se les ha sometido a su jurisdicción; pero una vez más he de repetir lo que en Memorias anteriores he indicado, *y es que para el legislador son las formas de los testamentos tan esenciales, que de nada sirve poder acreditar cumplidísimamente por cuantos medios reconoce nuestro Derecho y por todos juntos reunidos, no ya la intención, sino la voluntad expresa de una persona respecto del destino de sus bienes para después de su muerte, si no se consigna de alguna de las maneras establecidas en la ley,* si al emplear éstas no se observan todos y cada uno de los requisitos establecidos, pues mientras tanto, para el legislador, la manifestación de la voluntad no es sino la manifestación de una intención que necesita inscribirse y registrarse, digámoslo así, para adquirir verdadero carácter de *voluntad legal.* Este es el criterio que preside al precepto del art. 687 del Código, según el que será nulo el testamento en cuyo otorgamiento no se hayan observado las formalidades respectivas establecidas, y este es el mismo criterio con que el Tribunal Supremo ha procurado resolver reiteradamente todas las cuestiones de esta índole que le han sido propuestas. Bastaría para ello que tal fuese el criterio legal, pero es que también es el más racional, porque si desaparecida la persona del testador fuese lícito abrir juicio para debatir lo que quiso hacer de sus bienes y derechos, si se relajasen las condiciones de garantía de que se hallan revestidos los diversos testamentos, quedaría abierta honda brecha en los preceptos que regulan la sucesión testada e intestada, por donde la codicia y la mala fe intentarían frecuentemente el asalto de los bienes relictos, una vez desamparada con la muerte su defensa por aquel cuya voluntad expresa o presunta se invocara . . . .' " (Énfasis en el original.) Sánchez Román, *Estudios de Derecho Civil,* Tomo 6°, Vol. 1°, págs. 440–441, 2da. ed., 1910.

La prevención de carácter absoluto para todo caso, hecha por el párrafo 4° del Art. 645, 31 L.P.R.A. sec. 2182, de que el notario hará siempre constar que, a su juicio, se halla el testador con la capacidad legal necesaria para otorgar testamento, recoge un elemento de formalidad fundamental, básico, que responde tanto hoy como en el pasado al propósito del legislador de dotar al acto testamentario de su carácter peculiar de negocio jurídico solemne, que tiene su origen en "la necesidad de obtener una mayor seriedad y ponderación en el querer testamentario; la precisión de que el mismo permanezca exento de toda extraña presión o influencia; la conveniencia de conseguir una mayor claridad y precisión en la manifestación de la voluntad, y, por último, la utilidad que representa una facilitación de la prueba. Todas estas circunstancias, a cual de ellas de mayor trascendencia, determinaron siempre en la Historia la exigencia de indeclinables requisitos formales para la validez del acto testamentario. Por eso, la evolución que los tiempos modernos ha determinado en la espiritualización de los negocios jurídicos no ha llegado al testamento y sigue firme la enseñanza general en la doctrina y el criterio universal en las legislaciones, de que el testamento es negocio solemne y sólo puede llevarse a efecto en la forma determinada de antemano por la ley." Puig Peña, *Compendio de Derecho Civil Español*, Vol. 6, pág. 159, 3ra. ed., 1976.

La sentencia sumaria revisada aduce como fundamento para negar relevancia al incumplimiento por el notario de la norma imperativa del citado Art. 645, 4° la ausencia de alegación por parte de los demandantes respecto a falta de capacidad del testador. El capital defecto hace el testamento más que nulo, inexistente y a la insuficiencia de su forma pueden limitar su ataque los actores. La falta del citado requisito desvirtúa la eficacia del testamento "aunque no exista, ni se haya por nadie suscitado duda de que contiene exactamente la postrimera voluntad del testador." Sentencia de 1 de diciembre

de 1927, Supremo de España, Jr. Civil Núm. 7, Tomo 97, pág. 41 y ss.

La afirmación hecha por el notario de la capacidad del testador alcanza el rango de fuerte presunción *juris tantum* que sólo podrá ser destruida en juicio por pruebas cumplidas y convincentes de que en el acto del testamento no se hallaba el testador en su cabal juicio. Destaca la presunción favorable a la capacidad del testador y el rigor de la norma impuesta por el dicho Art. 645, 4° del Código Civil, la sentencia del Supremo español de 23 de marzo de 1944[6] cuando afirma "que en materia de testamentifacción activa, la capacidad intelectual del testador para poder prestar consentimiento es inicialmente apreciada por el Notario y los testigos, quienes procurarán asegurarse de que, a su juicio, hay capacidad en el otorgante, afimándolo así en el mismo testamento, por ser requisito ineludible en orden a su validez formal, según disponen los Arts. 685 y 687 del Código Civil, sin que sea preciso amparar expresa y concretamente en la fe pública esta afirmación, a diferencia de otras, como la de conocimiento del otorgante y testigos—Arts. 156, 185 y 187 del Reglamento del Notariado—no obstante lo cual adquiere especial relevancia de certidumbre la aseveración notarial, y por ella es preciso pasar, mientras no sea sometida a revisión en vía judicial y se demuestre cumplidamente la incapacidad del testador, destruyendo la enérgica presunción *juris tantum* que en sentido contrario revela el acto de otorgamiento, en el que se haya llenado el requisito de tamizar la capacidad del testador a través de la apreciación puramente subjetiva que de ella hayan formado el Notario y los testigos."

Castán Tobeñas[7] estima causa de nulidad total la falta de aseveración por el notario de hallarse el otorgante en la integridad de sus facultades mentales y de confirmarlo así

[6] *Jurisprudencia Civil*, segunda serie, Tomo 6 (Ed. Reus), señalada en N° 32, págs. 287 a 295.

[7] *Derecho Civil Español*, Tomo 6, Vol. 2, pág. 421, 7ma. ed., 1973.

los testigos, aunque se haya recabado el dictamen de dos médicos, citando Sentencia de 18 de noviembre de 1915.[8]

(b) Falta de expresión de la hora de otorgamiento.

El citado Art. 645 del Código Civil exige expresión de la hora en el testamento, omisión que en *Pacheco* v. *Sucn. Pacheco*, 66 D.P.R. 796, 801 (1947), consideramos insubsanable y que "produce inevitablemente la nulidad del testamento," y que confirmamos en *Quiñones* v. *Escalera Irizarry*, 99 D.P.R. 962, 967 (1971), al expresar que un testamento abierto sin dicho requisito es ineficaz.

Transcribimos la parte pertinente al cierre del testamento que muestra en alto relieve el vicio de nulidad:

". . . de todo lo cual así como de haberse cumplido todas las formalidades que expresa la Sección Quinta, Capítulo Primero, Título Tercero, Libro Tercero del Código Civil, y de haberse otorgado este testamento en un solo acto, yo, el Notario, DOY FE . . . .

Este testamento se comenzó a leer a las cinco y treinta de la tarde y se terminó de leer y firmar a las seis menos veinte. [firmado] WILSON F. COLBERG."

El notario que ha necesidad de recurrir a la adición o apostilla debe dar fe y certificar el contenido de la adición, en cumplimiento no sólo del Art. 649 sino también de la Sec. 17 de la Ley Notarial, 4 L.P.R.A. sec. 1017.[9]

---

[8] Manresa es de igual criterio que expone al decir que si las palabras no son esenciales, lo es la formalidad en sí, citando de la Sentencia de 18 de noviembre de 1915. *Comentarios al Código Civil Español*, Tomo 5, pág. 671, 7ma. ed., 1972.

[9] "No es preciso que el notario exprese que da fe en cada cláusula escrituraria de la estipulación o declaración que contenga, ni de las condiciones o circunstancias legales de las personas o cosas a que se refiera; bastará que consigne una vez, al final del documento, que certifica de todo lo contenido en el mismo, para que tal expresión se entienda aplicada a todas las palabras, estipulaciones, manifestaciones y condiciones reales o personales, contenidas en el instrumento, con arreglo a las leyes." 4 L.P.R.A. sec. 1017. *Felici & Cía.* v. *Registrador*, 11 D.P.R. 594, 595–96 (1906).

El notario ha debido repetir o reiterar la fe, o en acto equivalente expresar que "certifica" la autenticidad de lo añadido. La autenticación es el eje del Derecho Notarial, sin la cual no se concreta su trascendental función pública de investir todos los actos en que interviene de una presunción de veracidad que los hace aptos para imponerse por sí mismos en las relaciones jurídicas y para ser impuestos, por su propia virtualidad, por el poder coactivo del Estado. De la fe expresada en una forma u otra emana el valor probatorio, [10] la presunción legal de veracidad atribuida al notario como hombre de ley, probo y verdadero, facultado para dar fe pública de los hechos y convenciones que en su presencia acontecen.

El criterio opuesto se abraza al error de la sala de instancia negando la existencia de defectos fundamentales en el testamento relacionados con la capacidad del testador y la expresión de la hora porque los recurrentes no han cuestionado tal capacidad o la existencia de otros testamentos. Se incide apelando a hechos y datos extrínsecos para apuntalar la básica insuficiencia del testamento, método incompatible con la doctrina, que lo evalúa por la corrección de su forma.

"La nulidad procede de vicios de forma del testamento, pues el fondo o contenido del mismo no afecta a la nulidad total del documento, a diferencia de lo que sucedía en el derecho romano, que nula la institución de heredero o no existiendo ésta, se anulaba. Hoy no; la existencia o nulidad de alguna institución contenida en el testamento, anulará la disposición a que se refiere la nulidad, pero quedan subsistentes las demás disposiciones del testamento, y éste subsiste válido produciendo sus efectos.

---

[10] Art. 1170 Código Civil—"Son documentos públicos los autorizados por un notario o empleado público competente, con las solemnidades requeridas por la ley." 31 L.P.R.A. sec. 3271.

Art. 26.—Ley de Evidencia—"En la interpretación de un estatuto o documento, el ministerio del juez es simplemente averiguar y declarar lo que textualmente y en substancia contiene, no insertar lo que se hubiere omitido, ni omitir lo que se subiere insertado . . . ." 32 L.P.R.A. sec. 1669.

La nulidad, pues, se refiere a la forma de los testamentos, a los requisitos esenciales que constituyen formalidades o solemnidades de los mismos y que afecten a la esencia y validez del otorgamiento. En esto se diferencia fundamentalmente la revocación de la nulidad, pues aquélla presupone la validez del testamento y pierde su eficacia éste por la voluntad expresa o presunta del testador, mientras que la nulidad supone siempre la invalidez y nunca ha podido producir efectos." Valverde, Tomo 5, *supra,* pág. 141.

Resulta irrelevante toda exégesis sobre si la hora o momento de otorgamiento ha de expresarse al principio o al final. El defecto no es de ubicación, sino de exclusión. La hora expresada en apostilla de puño y letra del notario debajo de la dación general de fe quedó fuera de la garantía de fe pública de que se propuso investir el restante texto.

La afirmación de que el notario dio fe de la hora de otorgamiento es inexacta. Como hemos expresado la nota informal conteniendo la hora quedó fuera de la dación general de fe con que cierra el testamento. La fe hay que expresarla con la frase clásica de "doy fe", "repito o reitero la fe", o con una análoga como "certifico". Por segunda vez el notario no siguió la letra del Código ni lenguaje equivalente. Huelga añadir que su firma no suple la fatal deficiencia porque el notario cuando firma como testigo, por ejemplo, no da fe.

Este es otro defecto fatal que hiere de nulidad el testamento sin necesidad de más prueba. Pero hay otro aspecto en esta cuestión que debió excluir la decisión sumaria adoptada por la sala de instancia. La apostilla o adición donde el notario hizo constar la hora fue hecha con tinta o lápiz que a diferencia del restante texto y firmas, no aparece revelada en la fotocopia (Autos, pág. 53) indicativo de que testador, testigos y notario firmaron con una pluma y este último usó una distinta para escribir de su puño y letra la adición crítica. Este dato plantea un problema de falta de unidad de acto, digno de depuración en vista. El Art. 649, 31 L.P.R.A. sec. 2186, además de imponer el requisito de dación de fe en cuanto a

haberse observado todas las formalidades, ordena que éstas se practiquen en *un solo acto.*

(c) No aparece que el testamento se leyera en alta voz.

Instruye el Art. 645 que redactado el testamento "se leerá en alta voz, para que el testador manifieste si está conforme con su voluntad."

El testamento del Sr. Rodríguez Moreno fue otorgado en un cuarto de hospital donde languidecía en la etapa terminal del cáncer que extinguió su vida siete días después. Su firma intenta una elipse que puede ser indicio de simple incomodidad en su lecho, o de confusión en su intelecto derivada de su avanzada decadencia orgánica. El Notario autorizante hizo constar que tanto el testador como los testigos leyeron por sí mismos el testamento, mas omitió toda mención de haberlo él leído en voz alta a dichos firmantes. No es que este defecto, como los demás discutidos, produzca sin más la nulidad del documento, puesto que la falta de hacer constar la lectura queda en la faz subsanada por la aseveración de que se cumplieron "todas las formalidades que expresa la Sección Quinta, Capítulo Primero, Título Tercero, Libro Tercero del Código Civil" según lo autoriza el Art. 649.([11]) No obstante, planteado en el párrafo 8° de la demanda enmendada que no se cumplieron dichas formalidades, no es la sentencia sumaria el medio procesal adecuado para adjudicar cuestiones fundamentales que conciernen a la capacidad tanto físico como intelectual del testador para leer y entender por sí el texto del testamento pre-redactado por persona distinta al notario otorgante; y especialmente, atendida la condición de salud del testador, sería siempre justiciable y digna de vista en los méritos la cuestión suscitada por los recurrentes de si en el momento de testar tenía el testador enervadas sus potencias anímicas de raciocinio y de querer con verdadera y clara elección, dentro de un horizonte mental corriente.

---

([11]) Art. 649.—". . . El notario dará fe, al final del testamento, de haberse cumplido todas dichas formalidades. . . ."

En declaración jurada de 6 de abril de 1978 el notario autorizante Sr. Colberg informa que el proyecto de testamento le fue entregado por el abogado Sr. Enrique Leo Henríquez, a quien el testador designaba albacea ([12]) relevado de fianza.

La observancia del requisito de lectura del testamento por el notario pudo haber sido fácilmente comprobada, pues en dicha declaración jurada el Lic. Colberg dice que su colega Henríquez había llevado una grabadora al hospital en la que supuestamente grabó todo lo actuado, pero al final indica que iniciado el pleito y al inquirir sobre la grabación el Lic. Henríquez le informó que ninguna existía porque "aparentemente la cinta de la grabadora estaba dañada . . . ." ([13])

Comentando la exigencia de lectura del texto por el notario en alta voz, para que puedan enterarse de su contenido el otorgante y los testigos, dictamina Manresa: ([14]) "Este requisito de lectura es de los más esenciales y precisos, y no puede omitirse en ella extremo alguno a fin de depurar si al redactar las cláusulas de que consta fueron o no interpretadas fielmente las manifestaciones hechas por el testador, o los términos en que se hallaba concebida la minuta o el proyecto de testamento, en el caso de haberse expresado la voluntad por escrito, conforme al artículo 696 [646 PR]. La importancia que, según hemos dicho, tiene la lectura del instrumento pú-

---

([12]) El Lic. Henríquez renunció el albaceazgo poco después del otorgamiento. Fue él también quien escogió los testigos instrumentales.

([13]) Hay un perceptible hilo vinculante entre esta situación de hechos y la expresión del tercero demandado Lic. Colberg en su memorando de 7 de marzo de 1978 en oposición a la solicitud de sentencia sumaria de los demandantes: "No obstante, de entender este Tribunal que no hemos sido lo suficientemente precisos o claro en nuestra exposición, invocamos el precedente expuesto en *Valcourt Questell* v. *Tribunal Superior*, 89 D.P.R. 827 en el sentido de que una parte tiene derecho a un juicio plenario, cuando existiere la más leve duda en cuanto a un hecho material, debe resolverse en contra de quién promovió dicha Solicitud." Pág. 28, Memo, y 85 del Apéndice de la Solicitud de Revisión.

([14]) Comentarios al Código Civil Español, Tomo 5, págs. 724–25, 7ma. ed., 1972.

blico una vez redactado, demuestra por sí sola que la omisión de dicho requisito tiene necesariamente que constituir una causa de nulidad de testamento, no ya por el precepto del artículo 687, [636 PR] de perfecta aplicación en este caso, sino también y muy principalmente por el fin a que obedece y el objeto que se propone la exigencia de esta formalidad." Aun cuando el notario hubiese afirmado en el propio testamento haber guardado el requisito del Art. 645 leyéndolo en alta voz, las circunstancias anómalas sacadas a la luz por el propio afidávit del notario autorizante, demandarían una depuración de hechos por el tribunal en juicio plenario.

(d) Infracción del Art. 630(2) del Código Civil por no tener uno de los testigos calidad de vecino de San Juan, lugar de otorgamiento.

Ya sometido este recurso para decisión se resolvió por este Tribunal que la arriba dicha no es causa de inhabilidad absoluta del testigo. *Rivera Pitre* v. *Galarza Martínez*, 108 D.P.R. 565 (1979).

Revocaría la sentencia revisada y en su lugar dictaría otra sumaria anulando el testamento y devolviendo el pleito a instancia para continuación de procedimientos relacionados con la demanda contra el notario tercero demandado para determinación de su responsabilidad, si alguna, bajo el Art. 655 del Código Civil.

—O—

Voto particular del Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 25 de mayo de 1979

He dado mi conformidad a la ponencia del Juez Asociado Señor Díaz Cruz. Debo, no obstante, hacer esta expresión en relación con la omisión en el testamento de que a juicio del notario y de los testigos el testador tenía, al momento del otorgamiento, la capacidad legal necesaria para testar. Con respecto a los demás planteamientos, sólo cabe señalar que, independientemente de si son o no suficientes para invalidar el

testamento, acusan un descuido imperdonable en el ejercicio de la función notarial, particularmente en esta área sensitiva de la testamentifacción activa.

Como tantas veces se ha señalado, en todo testamento otorgado ante notario "procurarán el notario y los testigos asegurarse de que, a su juicio, tiene el testador la capacidad legal necesaria para testar." Art. 634, Código Civil, 31 L.P.R.A. sec. 2150. Cuando del testamento abierto se trata—que es el caso ante nos—"[el] notario hará siempre constar que, a su juicio, se halla el testador con la capacidad legal necesaria para otorgar testamento." Art. 645, Código Civil, 31 L.P.R.A. sec. 2182.

Aquí el notario hizo constar que el testador le aseguró a él, el notario, "hallarse en pleno goce y ejercicio de sus derechos civiles" pero no hizo constar que a su juicio, es decir, a juicio del notario, tenía en aquel momento el testador la capacidad legal necesaria para testar.

Convengo en que los "derechos civiles" a que se refiere esta escritura, frase que se ha venido usando en la práctica notarial desde tiempo inmemorial, no significan derechos políticos o los derechos individuales de que goza todo ciudadano en nuestro sistema democrático. Estoy de acuerdo en que la frase "derechos civiles" en el testamento se refiere al concepto civilista, es decir, a la facultad de poder disponer libremente de los bienes incluyendo la facultad de testar. Parte esencial de esa capacidad es estar cuerdo, no estar impedido mentalmente. Y en cuanto a esto, no es el criterio del testador el determinante de su capacidad, sino el del notario y de los testigos. ¿Acaso algún loco admite que está loco? El notario tiene la obligación de consignar por los dichos del testador, aquellos detalles sobre sus circunstancias personales que el testador conoce mejor que nadie pero, independientemente del criterio del testador, debe consignar su propio criterio, su juicio ponderado de que el testador está capacitado legalmente para testar.

Se pretende que el notario, donde dice que el testador "me asegura hallarse en pleno goce y ejercicio de sus derechos civi-

les," entendía que con ello estaba consignando su juicio personal de que el testador tenía la capacidad legal necesaria para testar. Esto es, a mi juicio, una racionalización *a posteriori* que no puede justificar el descuido del notario. No es este testamento un modelo de expresión literaria y científica donde el notario quiso hacer gala de su erudición. Es un instrumento tan descuidado en su redacción que mal puede ese descuido fatal curarse, por mucha gimnasia mental que se haga. No puede pasarse por alto que aquí el notario autorizante no fue quien redactó el testamento.

Para mí es evidente que por una inadvertencia, al escribir el testamento en maquinilla, se omitió la frase "la capacidad legal necesaria para testar" que requiere el Art. 645 y que leemos en todos los testamentos abiertos. La redacción debió ser:

"Me asegura hallarse en pleno goce y ejercicio de sus derechos civiles y teniendo a mi juicio y al de los testigos instrumentales que se mencionarán más adelante y quienes me aseguran conocer al compareciente, oirle, verle, y entenderle, *la capacidad legal necesaria para testar,* ordena y formaliza, su última voluntad bajo los hechos y declaraciones siguientes:".

La secretaria que pasó el testamento en maquinilla saltó y omitió la frase subrayada. Aceptar que tal omisión fue voluntaria y que donde dice *teniendo* quiso decirse *teniéndolo,* para así salvar la omisión, sería forzar demasiado mi candidez.

—O—

Opinión emitida por el Juez Asociado Señor Negrón García a la cual se unen los Jueces Asociados Señores Torres Rigual y Martín.

San Juan, Puerto Rico, a 25 de mayo de 1979

Es correcta y justa la sentencia sumaria[1] declarando

---

[1] Se produjo a petición de los demandantes recurrentes quienes afirmaron no ser necesario presentar prueba por surgir la alegada nulidad

válido el testamento abierto otorgado por Miguel Angel Rodríguez Moreno mediante escritura Núm. 27 de fecha 4 de septiembre de 1974 ante el notario público Wilson F. Colberg—una semana antes de su fallecimiento en un hospital de San Juan, debido a cáncer pulmonar—y desestimando la demanda de nulidad incoada por sus hijos Michael I., Bárbara Frances y Gloria de apellidos Rodríguez *Sardenga* contra su viuda Andrea Soto Rivera e hijos menores Brenda y Gay Rodríguez *Soto.* El notario autorizante Colberg fue demandado como tercero.

A manera de paréntesis, como exordio, cabe destacar que el acto jurídico notarial de mayor trascendencia, por sus graves consecuencias, es el testamento. Como dijimos recientemente, "debido a que en el momento en que una disposición testamentaria ha de surtir sus efectos, el protagonista del documento no está presente para aclarar cualquier extremo, se exige que el acto esté rodeado con las mayores garantías posibles en cuanto a aspectos tales como el documento, funcionario autorizante, capacidad del testador, características de los testigos, firmas y otros." *Rivera Pitre* v. *Galarza Martínez,* 108 D.P.R. 565 (1979). Y más aún, "[l]a competencia, preparación y prestigio del Notario es lo que está en juego en el momento solemne del testamento . . . .", pues no puede olvidar que "[e]s la forma lo que da origen, existencia y vida al testamento: *forma dat erse rei . . .* la forma perfecta es el escudo, podemos decir, de la voluntad; la forma imperfecta la hace ineficaz." Yorio A., *Valor Internacional del Documento Notarial,* Segundo Congreso Internacional del Notariado Latino, Tomo IV, 305, 307 (1950). Ello obliga a los tribunales adjudicar con absoluta juridicidad casos como el que nos ocupa, en que se plantean serios y novedosos señalamientos de

---

del propio testamento (pág. 54, Apéndice). Los demandados y el notario demostraron, tanto en instancia como ante nos, la procedencia de un dictamen rápido, pero sosteniendo la última voluntad del testador. (Págs. 84 y 85, Apéndice.)

errores, atribuíbles a la manera laxa y al lenguaje controversial(²) utilizado por el notario autorizante al descargar su encomienda, olvidando en cierto modo la función rectora de precaver. Vallet, *La Función del Notariado y la Seguridad Jurídica*, Rev. Jur. Not., Núm. 92, 211–212 (1976). Examinemos los apuntamientos.

## I

En el primero, los recurrentes argumentan la nulidad absoluta del instrumento por alegadamente no expresar la "hora" de otorgamiento conforme lo exige el Art. 645 del Código Civil.(³) En efecto, según nuestra jurisprudencia, la omisión de la hora vicia radicalmente todo testamento abierto. *Quiñones* v. *Escalera Irizarry*, 99 D.P.R. 962, 967 (1971). La necesidad de su observancia responde a dos objetivos, a saber, la determinación de si el testador tenía o no la capacidad legal necesaria en el acto del otorgamiento, y la evaluación—en caso de existir varios testamentos de misma fecha otorgados por el testador—de cuál de ellos es anterior o posterior a los efectos de su derogación o subsistencia. *Pacheco* v. *Sucn. Pacheco*, 66 D.P.R. 796, 800 (1947). Como nos advierte Manresa, "[e]n el deseo de rodear el testamento abierto del mayor número de precauciones posibles, el legislador, terminantemente, previene que en el testamento se exprese el lugar, el año, el mes, el día y la hora del otorgamiento, como otros tantos datos que pueden contribuir a depurar la eficiencia y autenticidad del mismo." *Comentarios al Código Civil Español*, Vol. V, 723 (1972).

---

(²) Cobra relevancia la siguiente reflexión: "El Derecho, al convertirse en regla jurídica, toma forma práctica por medio de la palabra, y claro es que para entender y aplicar ésta con recto sentido no pueden ser indiferentes el arte del lenguaje y la ciencia del bien hablar." Sánchez Román, *Estudios de Derecho Civil*, Tomo I, 62 (1899).

(³) En lo pertinente reza:

"El testador expresará su última voluntad al Notario y a los testigos. Redactado el testamento con arreglo a ella y con expresión de lugar, año, mes, día y hora. . . ." 31 L.P.R.A., sec. 2182.

El examen del testamento ante nos, nos mueve a concluir que el error no fue cometido. Hay expresión suficiente y válida de la "hora" en su última hoja. En lo pertinente lee así:

"Tal es el testamento que el compareciente otorga, ante mí y en presencia de los testigos instrumentales, Miguel Angel Serrano, Luis G. Maldonado Cortés y José Irizarry Lugo, todos mayores de edad, soltero los dos primeros y casado el tercero y de esta vecindad. [*Sic*] ...............................
a quienes doy fe también de conocer personalmente y previa lectura que hizo el otorgante y testigos de este testamento en uso del derecho que les concede la Ley del cual fueron advertidos, se ratificó el primero en su contenido y luego de estampar sus iniciales en todas las hojas, la firma en la última en unión de los citados testigos, de todo lo cual así como de haberse cumplido todas las formalidades que expresa la Sección Quinta, Capítulo Primero, Título Tercero, Libro Tercero del Código Civil, y de haberse otorgado este testamento en un solo acto, yo, el Notario, DOY FE.
*Este testamento se comenzó a leer a las cinco y treinta de la tarde y se terminó de leer y firmar a las seis menos veinte.* [firmado] WILSON F. COLBERG." (Bastardillas nuestras.)
(Seguidamente aparecen las firmas del testador, y de los testigos Miguel Angel Serrano, Luis G. Maldonado Cortés y José Irizarry Lugo, y del abogado notario, en este orden).

La parte que hemos subrayado es la que consigna la hora del otorgamiento y está en manuscrito del notario. Los demandantes recurrentes no han cuestionado la capacidad del testador o la existencia de otros testamentos. Sin embargo, entienden que la expresión de la hora después de la "fe general" viola la Sec. 17 de la Ley Notarial(⁴) por no haber dicho

---

(4) Como fuente de derecho supletorio autoriza en su Sec. 17 que el notario exprese mediante certificación su fe ". . . al final del documento, que certifica de todo lo contenido en el mismo para que tal expresión se entienda aplicada a todas las palabras, estipulaciones, manifestaciones y condiciones reales o personales contenidas en el instrumento, con arreglo a las leyes." 4 L.P.R.A. sec. 1017. Véase *Cintrón* v. *Cintrón,* 70 D.P.R. 770, 781-782 (1950).

funcionario subsiguientemente dado fe y certificado su contenido. No tienen razón. El Código Civil guarda silencio sobre la forma, modo o sitio en que deberá consignarse la hora. La práctica notarial puertorriqueña se inclina mayoritariamente a reconocer que el requisito de la hora se consigna al principio o en el encabezamiento del testamento—como parte de la comparecencia—conjuntamente con la expresión del sitio y la fecha. Malavet Vega, *Notas Sobre el Derecho Notarial Puertorriqueño*, 143-144 (1968)—Mimeógrafo; E. Menéndez, *Lecciones de Derecho Notarial*, 237 (1967); J. C. González, *Instrumentos Públicos*, 274 (1947). Sin embargo, algunos autores españoles e italianos sostienen con cierta lógica que se trata de un dato que es susceptible de, y preferentemente debe, aparecer con posterioridad a las cláusulas testamentarias.

"Al exigir el art. 695 [concordante al 645] que se consigne incluso la hora, se refiere a la hora 'de su otorgamiento', con lo cual se quiere prever la contingencia de que aparezcan dos testamentos otorgados el mismo día. Pero como el otorgamiento es un acto que ha de durar algún tiempo, se ha discutido a veces si el Notario cumple con hacer constar en cabeza del testamento, a continuación de la fecha, y como parte de ella, el momento en que se empiezan a cumplir las formalidades prescritas, o si debe consignarse después la hora en que se firma, *lo cual parece lo más conveniente, ya que éste es en realidad el momento en que la voluntad del testador queda convertida en testamento.*" (Bastardillas nuestras.) Ossorio Morales, *Manual de Sucesión Testada*, 85 (1957).

Igual criterio comparte Puig Brutau, *Fundamentos de Derecho Civil*, Tomo V, Vol. II, 77 (1977).

Antonio Cicu en su reputada obra *El Testamento*, acepta esta posición y resume la idea así:

*"Se exige la indicación de la hora de la firma porque ésta perfecciona el testamento* y porque—respecto a las cuestiones de incapacidad o revocación—puede interesar saber el momento en que se produjo el perfeccionamiento. En tal sentido debe enten-

derse por hora no la mera indicación de una de las del día, sino también con expresión de los minutos.

Dado este carácter de la indicación de la hora, puede considerarse que ésta es un elemento de la fecha del acto, de lo que no se deduce que se haya de poner junto con la mención del día, mes y año que se indican al principio del instrumento. En un caso en que no se hizo así, la Casación se pronunció por la validez del testamento, advirtiendo que la ley no indica en qué lugar se ha de poner tal indicación. Pero esto no ha de llevarnos a admitir que el notario pueda prescindir de precisar que la hora que se indica se refiere al momento de la firma. *Será por ello más correcto que se haga esta indicación al final del instrumento y en rigor debiera ir después de las firmas, pero como quiera que éstas concluyen el acto (pues de otro modo se debería firmar de nuevo después de la mención de la hora), se podrá poner aquella en el momento en que se vaya a proceder a la firma, o bien dejar un espacio en blanco y completarlo inmediatamente después de haber firmado.*" (Bastardillas nuestras.) Traducción por Manuel Fairén Martínez (1959).

Y Armero precisa:

"La hora que debe consignarse se refiere a un momento concreto, al del otorgamiento, y no al lapso de tiempo empleado, así dice la Sentencia de 19 de enero de 1928: 'Que no puede ser motivo de nulidad el que no se concreten los minutos que dure la lectura de ningún documento notarial'." Armero Delgado, *Testamento y Particiones,* 140 (1951).

Ante estas opiniones, resolvemos que en el testamento ante nos, es válida la expresión de la hora. Primeramente, se trata de un dato que corresponde verificar y hacer constar al notario. De ordinario no es susceptible de anticiparse con exactitud. Su consignación *a priori* plantea serias interrogantes y resultaría riesgoso por lo difícil que a veces es reunir en lugar y tiempo—con precisión matemática—testador, testigos y notario. "Puede expresarse a principio, junto con las demás circunstancias cronológicas, o en el otorgamiento haciendo constar la hora en que se realiza; por exigencias de la práctica más que por requerirlo los principios es conveniente expresarla en esta última forma, al hacer el otorga-

miento, porque al comenzar la redacción del testamento es difícil calcular la hora en que será otorgado y aún calculándolo es muy expuesto a error por las múltiples circunstancias que puedan interferirse entre la manifestación de la voluntad del testador y la lectura y aprobación del testamento redactado." García Honorio, *El Reglamento y la Distribución de las Escrituras y los Testamentos*, Rev. Der. Not., Tomos 5–6, 413 (1954). En consecuencia, el requisito de hora se cumple con validez exponiéndose al inicio o final del testamento. Y en circunstancias como las de autos en que la suscripción es en una habitación de un hospital, lejos de las facilidades de la oficina y del personal secretarial del notario, las posibles diferencias—e inferencias imaginadas—en el tipo de tinta usada entre la cláusula exponiendo la hora y las firmas posteriores, más que debilitar, fortalecen la fe notarial en cuanto a su corrección, veracidad y unidad del acto.

En segundo lugar, advertimos que el notario Colberg consignó con su puño y letra la hora y el tiempo exacto que tomó el otorgamiento del documento matriz. Lógica y naturalmente tal actuación—de su única competencia—no puede estimarse en calidad de testigo, pues ". . . la firma del notario, . . . no tiene tal carácter, sino el de perenne señal de sanción o recibimiento público, característica que pertenece a la autorización", Bellver Cano, citado por Neri, *Tratado Teórico y Práctico de Derecho Notarial*, Tomo 3, 723 (1970). Su afirmación de la hora es de índole notarial por estar legítimamente amparada, por propia naturaleza, en la fe que respalda su firma. "De ninguna manera la frase *doy fe* debe ser considerada como la palabra misteriosa, el *ábrete, Sésamo*, ante cuya sola virtud se abren las puertas de la autenticidad, conclausas para todo aquel que no acierte á pronunciarlas." Fernández, *Tratado de Notaría*, Tomo I, 527.

Finalmente, el que el notario redactara la cláusula contentiva de la hora después de la "dación de fe general" no desvirtúa su eficacia, pues la Sec. 18 de la Ley Notarial con-

templa que sólo "[s]erán nulas, las *adiciones*, apostillas, entrerrenglonaduras, raspaduras y testados en las escrituras matrices, *siempre que no se salven al fin de éstas, con aprobación expresa de las partes y firmas de los que deben suscribir el instrumento*." 4 L.P.R.A. sec. 1018 (Bastardillas nuestras.) Bajo este precepto podemos reconocer dos supuestos de validación: (a) que su firma notarial era suficiente para validar la enmienda. Ello es así, pues lo que la ley exige es ". . . que el salvado de las enmiendas se efectúe 'con aprobación expresa de las partes y firmas de los que deban suscribir el instrumento', pero ello sólo es cierto en términos generales; *cuando la enmienda afecte solamente a un elemento formal del documento sujeto a la exclusiva jurisdicción del Notario, podrá éste por sí solo salvar la enmienda*." A. Rodríguez Adrador, *Formación del Instrumento Público, Validez, Eficacia y Libre Circulación del Negocio Jurídico así Documentado, Incluso en las Relaciones de Derecho Internacional Privado*, Rev. Der. Notarial, Núms. 97–98, 248–249 (1977) (Bastardillas nuestras.); y (b) que las firmas del testador, de los testigos y del notario, suscritas subsiguientemente a esta cláusula, al final del testamento, salvan cualquier reparo sobre el requisito de la hora.

## II

En su segundo planteamiento los demandantes recurrentes alegan que el notario no observó lo dispuesto en el Art. 634 del Código (5) respecto a expresar que el testador tenía

---

(5) Reza:

"El notario y dos de los testigos que autoricen el testamento deberán conocer el testador, y si no lo conocieren, se identificará su persona con dos testigos que le conozcan y sean conocidos del mismo notario y de los testigos instrumentales. *También procurarán el notario y los testigos asegurarse de que a su juicio tiene el testador la capacidad legal necesaria para testar.*

Igual obligación de conocer al testador tendrán los testigos que autoricen un testamento sin asistencia de notario, en los casos de las secs. 2187 y 2188 de este título." 31 L.P.R.A. sec. 2150. (Bastardillas nuestras.)

Observamos, además, que el Art. 645, *in fine*, exige que el notario haga constar siempre en el testamento, si a su juicio, se halla el testador

"capacidad legal" para otorgar el testamento al cuestionar la suficiencia de la siguiente cláusula:

"Doy fe de conocer personalmente al compareciente y también la doy de sus circunstancias personales con relación a su dicho. *Me asegura hallarse en el pleno goce y ejercicio de sus derechos civiles y teniendo a mi juicio y al de los testigos instrumentales que se mencionarán más adelante y quienes me aseguran conocer al compareciente, oirle, verle y entenderle . . . ."* (Bastardillas nuestras.)

Admitimos la necesidad e importancia de la calificación notarial de capacidad, requisito fundamental para la eficacia del testamento abierto. Giménez Arnau, *Instituciones de Derecho Notarial,* Tomo II, 102–104 (1954). Sin embargo, somos de opinión que la contención de los recurrentes responde a un enfoque dogmático y a un exagerado criterio de estricto formalismo, innecesariamente restrictivo y olvidadizo de dos principios de hermenéutica, a saber, que "[n]uestra jurisprudencia se pronuncia en el sentido de descartar el valor sacramental de las palabras para atender más a la voluntad del testador que al sentido literal de aquéllas"— *Vivaldi* v. *Registrador,* 86 D.P.R. 629, 641 (1962)—y que "[e]l notario no está obligado a emplear las mismas palabras que expresa nuestro Código en su art. 645 . . . pudiendo usar otras distintas que indiquen la misma idea, pues 'lo esencial no son las palabras empleadas, sino que el notario *considera al testador con suficiente capacidad para testar.'* " *Paz* v. *Fernández,* 76 D.P.R. 742, 749 (1954). (Bastardillas en el original.)

Sobre la cláusula impugnada, la ilustrada sala sentenciadora concluyó:

"Aun cuando las palabras usadas por el notario no fueron tan claras como debieron ser, en el testamento objeto de este pleito, entendemos que se cumplió con la formalidad de ley. *De hecho*

---

con la capacidad legal necesaria para otorgar testamento." 31 L.P.R.A. sec. 2182. La génesis de estos preceptos la encontramos en Fernández, *op. cit.,* págs. 474–475.

*consideramos que cuando el notario dijo 'teniendo' quiso decir 'teniéndolo', lo cual se debió a un error clerical.* Se cumplió a nuestro juicio con lo dispuesto por ley." (Bastardillas nuestras.)

Coincidimos con el razonamiento de dicho foro. Primeramente, aun en su acepción restringida, (6) la definición de *derechos civiles* comprende "el conjunto de facultades que las leyes civiles conceden al individuo en su calidad de ciudadano de un Estado." *Enciclopedia Jurídica Española*, Tomo II, 321. La locución "hallarse en el pleno goce y ejercicio de sus derechos civiles" es una combinación oracional (7) y racional adecuada—aunque menos abreviada—semejante a la del concepto "capacidad legal" o "capacidad jurídica". A tal efecto la glosa informa:

"*El aspecto jurídico de la capacidad o incapacidad de la persona se relaciona con el goce y ejercicio de los derechos civiles.* Así, *gozar* un derecho significa poseerlo, con aptitud para disponer de él, y *ejercer* un derecho equivale a poder realizarlo. Comoquiera que sea, la acción de gozar y ejercer un derecho depende de las prescripciones de ley. *En esto no hay equívoco alguno, pues quien no pueda cumplir con el goce y ejercicio de un derecho, según las normas legales, será evidentemente un incapaz.*" Neri, *op. cit.*, 387. (Bastardillas nuestras.)

---

(6) Una definición más abarcadora indica:

"Hay que aclarar, además, que cuando alguien menciona los derechos civiles se refiere a derechos legales o jurídicos, establecidos por las leyes del país . . . . Es necesario insistir en el carácter legal de los derechos civiles para distinguirlos de otra idea o concepto muy parecido que se menciona y discute mucho hoy día: la idea de los derechos humanos . . . . *Pero son distintos porque el derecho civil tiene fuerza de ley en una comunidad mientras que el derecho humano es sólo una idea o una aspiración.*" J. B. Fuster, *Los Derechos Civiles reconocidos en el Sistema de Vida Puertorriqueño*, 1–2 (1968—CDC) (7ma. ed.). (Bastardillas nuestras.)

(7) Si descomponemos la oración—a los fines de un análisis riguroso gramatical—advertimos las siguientes definiciones conforme el *Diccionario de la Real Lengua Española: hallarse* de hallar, "estar en cierto estado" (695); *pleno*, "completo, lleno" (1039); *goce*, "acción y efecto de gozar o disfrutar una cosa" (660); *ejercicio*, "acción de ejercitarse u ocuparse en una cosa"; *ejercer*, "practicar actos propios de un oficio, facultad, virtud, etc." (506); *derecho*, "facultad de hacer o exigir todo aquello que la ley o la autoridad establece en nuestro favor . . . ." (435); *civil*, "el [derecho] que regula las relaciones privadas de los ciudadanos entre sí." (*id.*)

Y el experimentado notario Omar A. Lassaga, en su obra *El Documento Notarial—La Fe de Conocimiento—El Juicio de Capacidad de los Otorgantes*, nos dice, citando a Salvat:

" 'Gozar de un derecho quiere decir tenerlo, ser titular de él. La persona que no goza de un derecho no puede tenerlo, es incapaz de ser el titular de él', y más adelante, el citado comentarista expresa: 'Ejercer un derecho quiere decir ponerlo en ejecución. *La persona que tiene el ejercicio de su derecho puede disponer libremente de ellos, enajenarlos, gravarlos, cederlos, etc. Por el contrario, la que no tiene su ejercicio, por ejemplo, el demente no puede realizar ninguno de esos actos.'* " *Segundo Congreso Internacional del Notariado Latino,* Tomo III, 232. (Bastardillas nuestras.)

El ámbito del juicio de capacidad notarial comprende las siguientes dimensiones:

"La afirmación de la capacidad del otorgante es un juicio jurídico y psicólogo bastante complejo, pues se apoya en una serie de hechos positivos unos (como la edad) y negativos otros (inexistencia de incapacidad expresa o prohibición). Además en el actuante hay que mirar no sólo a la aptitud o posibilidad de tenencia de derechos, sino a la inmediata posibilidad de ejercitarlos por sí mismos.

Los elementos que han de ser examinados para formular la afirmación de capacidad son los siguientes: 1. La capacidad del goce; 2. La capacidad del ejercicio para el acto jurídico de que se trate; 3. La inexistencia de prohibiciones expresas de la ley; 4. La conciencia libre y la voluntad actual. La existencia de vicios de la voluntad vicia el acto. Antes de autorizarlo, debe el Notario investigar discreta, pero escrupulosamente, el ánimo de cada uno de los otorgantes para evitar que el instrumento pueda ser posteriormente anulado por la ausencia del consentimiento o vicio del mismo; 5. En los casos especiales . . . ." Giménez Arnau, *op. cit.,* 105.

Aclarada la cobertura de las manifestaciones sobre constancia de capacidad antes indicadas, forzoso es concluir que la consignada por el notario Colberg en el testamento que nos ocupa, no sólo guardan cierto paralelo, sino que se desenvuelven con una valoración de equivalencia gramatical y notarial

al concepto vertido en el Código Civil. "Como aclaración y recuerdo, algo que no es de forma, sino de fondo: la capacidad para comparecer en instrumento público es la misma capacidad negocial o capacidad civil, que por pertenecer a la 'Teoría general de derecho' es común en todas sus ramas." Núñez-Lagos, *Los Esquemas Conceptuales del Instrumento Público*, Segundo Congreso Internacional Latino, Tomo I, 48 (1950).

Segundo, si bien al presente la frase "hallándose en el pleno uso de sus derechos civiles"—parecida, aunque menos completa que la usada—no es favorecida en la práctica de la notaría, hubo una época en que la misma era utilizada como fórmula correcta de expresión de capacidad suficiente del otorgante. Torres Aguilar, reproducido en *Apuntes de Derecho Notarial*, 10 Rev. Jur. U.P.R. 165–166 (1940). Aunque el derecho es vivo, el desuso de dicha dicción legal no implica que fuera un estilo jurídicamente erróneo.[8] La riqueza y versatilidad del idioma y las palabras en castellano permiten la construcción de diversas frases con la misma idea. De ordinario, en el escrito del legista el decir que una persona "se halla gozando y *ejercitando* plenamente sus derechos civiles", razonablemente su sentido no puede ser otro que una expresión e *impresión* notarial equivalente a que ella se desenvuelve con capacidad legal satisfactoria, esto es, está actuando activamente en virtud de su "competencia jurídica" y unos derechos reconocidos. Nadie puede negar que entre los atributos de esta aptitud jurídica está el disponer de su propiedad mediante testamento, ya que "[s]egún ha dicho un autor, *la testamentificación activa es el ejercicio del derecho de propiedad, y así como ésta es libre,* puede ejercer toda la facultad de testar, y su libertad debe imponerse mientras no se pruebe lo contrario." Manresa, *op. cit.*, 457. (Bastardillas nuestras.) Advertimos que un enajenado mental o incapaz posee "derechos civiles". Pero quien no está en su sano juicio

---

[8] Para un examen de otras fórmulas empleadas antiguamente, hoy descartadas, consúltese: Fernández, *op. cit.*, 530.

o carece de plena lucidez intelectual no es susceptible de estimarse que se halla en el "pleno goce y el ejercicio de sus derechos civiles." Así lo sugerimos en *Ortiz* v. *Bermúdez*, 70 D.P.R. 707, 713 (1949), al citar el comentario de Manresa, sobre la sentencia de 20 de mayo de 1911, en el sentido de que "a toda persona ha de reputársele en perfecta lucidez mental y con el pleno goce de sus derechos civiles . . . ." Y en *Andino* v. *Andino*, 83 D.P.R. 138, 140 (1961), consideramos suficiente la afirmación del notario de que el testador tiene "a mi juicio y el de los testigos, la capacidad legal necesaria para testar." Debe recordarse que la demencia no es otra cosa que una restricción de la "personalidad jurídica" para obrar. Art. 25, Código Civil, 31 L.P.R.A. sec. 82. La exigencia de dación de fe de capacidad por el notario es sólo "un refuerzo de la presunción *juris tantum* de capacidad del testador, que obliga a quien la impugna a probar cumplidamente dichas afirmaciones." Lacruz-Sancho, *Derecho de Sucesiones*, Tomo I, 340 (1971).

Repetimos, el estado de derecho vigente no obliga a que el notario haga constar en el testamento su juicio sobre la capacidad del otorgante empleando determinadas fórmulas o palabras—Puig Brutau, *op. cit.*, 24; Puig Peña, *Tratado de Derecho Civil Español*, Tomo V, Vol. I, 121 (1974)—aunque sí es recomendable que los notarios recurran a las fórmulas sencillas, claras y precisas aceptadas por la práctica y los tribunales. Deben poner el mayor de los empeños, siendo cuidadosos en las etapas de preparación y formalización, pues de lo contrario se exponen a dudas o pleitos como el de autos, y al riesgo innecesario de que el lenguaje en controversia no pase la prueba final judicial.

"Las palabras no tienen el valor de un conjuro de brujería. Lo que importa es que, con unas palabras o con otras, quede la idea clara, que es de lo que se trata. Siempre que se pueda, es *cómodo* usar las palabras mismas de la ley." G. Palomino, *Derecho Notarial*, Tomo I, 485 (1948).

En estas circunstancias, a tono con la doctrina prevaleciente, y aun reconociendo que la fraseología usada por el notario Colberg no es el mejor modelo de expresión(⁹)—apreciada la misma integralmente, con ánimo no prevenido y con sentido crítico—concluimos que ésta comunica adecuadamente el mensaje y la idea de que dicho notario daba fe de que el testador Rodríguez Moreno estaba capacitado legalmente para otorgarlo. "Entre nosotros, mejor dicho, en el Derecho moderno, las fórmulas no tienen valor mágico, sino instrumental. Sirven para expresar el pensamiento. Por encima de las palabras está la voluntad, o la realidad. Desde este punto de vista cabe afirmar que no hay fórmulas legales imperativas, de acatamiento servil. Ni siquiera el tradicional 'doy fe' es inexcusable." Palomino, *op. cit.*, 505.

### III

Los restantes errores carecen de mérito. Veamos.

El tercero referente al requisito de domicilio de uno de los testigos, residente en Guaynabo y no en San Juan, es improcedente en virtud de nuestra reciente decisión en *Rivera Pitre* v. *Galarza Martínez*, supra.(¹⁰)

---

(⁹) La búsqueda en la sencillez de una fórmula, mueve a Ignacio Nart, en su libro *Formulario Para la Práctica Notarial*, a recomendar como texto: ". . . testigos . . . , que ven, entienden y conocen al testador, a quién, como yo juzgan con *capacidad* para otorgar este testamento abierto . . . ." Indica este autor: "[l] imito el juicio a la 'capacidad' sin añadir 'legal' o 'legal necesaria', porque es una redundancia, ya que, mi apreciación es notarial: jurídica." (Págs. 214; 4.)

"Los notarios puertorriqueños, toda vez que la referida instrucción general indica que la determinación se hará a *juicio* del notario, . . . tomaron al pie de la letra la disposición y acuñaron la expresión 'teniendo a mi juicio la capacidad legal necesaria para otorgar . . . .'" Malavet, *op. cit.*, 152.

(¹⁰) La ilustrada sala de instancia, anticipando el cambio doctrinario, expresó:

"No podemos permitir, por ser injusto, que la voluntad del testador sea anulada *por el hecho de descalificar a un testigo que era su íntimo amigo* y que vive prácticamente en la colindancia del sitio que se otorgó el testamento (podríamos decir en el batey de ese lugar si se compara con

El alegado cuarto error no se cometió. Nuestro Código Civil ni la doctrina requieren que el notario autorizante taxativamente consigne que el testamento se leyó en alta voz. Basta, como se hizo, la certificación del funcionario "de haber cumplido con todas las formalidades que expresa la Sección Quinta, Capítulo Primero, Título Tercero, Libro Tercero del Código Civil . . . ." *Paz* v. *Fernández,* supra, 750–751.

Y finalmente, no son convincentes los señalamientos genéricos en el sentido de que estamos frente a un testamento nulo por ser "ad alterius interrogationen", y de que el tribunal sentenciador debió aplicar "la regla [de] que la evidencia voluntariamente suprimida le es adversa a la parte que la suprime." Estos apuntamientos no se elaboran apropiadamente y están argumentados sobre unas bases esencialmente especulativas.

Para dejar sin efecto la última voluntad de una persona es menester producir ante los tribunales prueba y argumentos de peso. *Dicat testator et erit lex.* La seriedad del acto y la presunción de corrección que ampara la fe pública notarial y su seguridad en el tráfico de bienes—necesarios para la estabilidad y armonía de una sociedad empeñada en dotar sus relaciones jurídicas con atributos de fijeza, certeza y autoridad—así lo exigen. "En rigor, lo que el notario afirma bajo su responsabilidad debe ser respetado, hasta que triunfe la impugnación por falsedad." Arnau, *op. cit.,* 66.

En cuanto al aspecto técnico jurídico de la sentencia sumaria, no se ha demostrado ni puesto en controversia un solo hecho que amerite un decreto sobre nulidad de testamento (fraude, dolo, falsificación, incapacidad). "Quien actúa en la zona de los hechos se habitúa a ser un esclavo de los hechos; adquiere una habituación mental de equilibrio, de pondera-

---

los límites del municipio de San Juan que llegan hasta Carolina, Trujillo Alto, Cataño y el San Juan antiguo) por aplicar unas palabras que no tenían la implicación del presente, además de responder a una interpretación del pasado, como dice Castán, a cuando los núcleos urbanos eran reducidos." (Bastardillas nuestras.)

ción [y] de imparcialidad. Los hechos son como ellos son y no como nosotros los deseemos. El naturalista sólo puede dominar a la naturaleza sometiéndose a sus leyes, según dijo Bacon. Acata la realidad humildemente." Palomino, *op. cit.*, 125. Circunscritos a los hechos del caso, nuestro sentido jurídico[11] nos mueve a sostener su validez. Con ello acatamos la clara y no contradicha postrera voluntad de su protagonista Rodríguez Moreno, favoreciendo a su esposa y mejorando naturalmente a sus hijos menores de edad, dentro de los límites permitidos del derecho sucesorio.

---

[11] "El sentido jurídico se funda en la lógica, pero es algo más elevado que el simple razonamiento: es la exacta percepción de lo justo, la capacidad de expresarlo y poder actuarlo, de igual manera que el sentido artístico es la sensación de lo bello y la capacidad de expresarlo en formas externas." Vallet, *La Misión del Notario,* Rev. Der. Not., Núm. 16, 410 (1957).